In re Stephen P. WOLFSON, Debtor.

EQUINE CAPITAL CORPORATION, a
Delaware corporation, Plaintiff,

v.

Stephen P. WOLFSON, Defendant.

Bankruptcy No. 90–777–BKC–3P7.
Adv. No. 90–156.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Dec. 28, 1992.

John B. Fuller, Hart, Fuller & Smith, P.A., Bryce W. Ackerman, Ocala, FL, for plaintiff.

James H. Post, Jacksonville, FL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This adversary proceeding is before the court upon complaint of Equine Capital Corporation seeking exception to discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), and (a)(6). The trial was held on June 3 and 4, 1992, and, upon the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law:

### Findings of Fact

Between 1971 and 1990, Defendant and his brother, Gary Wolfson, were partners in the operation of a horse farm trading as Happy Valley Farm. Between 1971 and 1985, the company flourished. Beginning in 1986, however, the horse industry experienced a decline which adversely affected the business.

Plaintiff, a Delaware corporation authorized to do business in Florida, operated as a lending institution to provide loan monitoring services to lenders in the thoroughbred horse industry. The loan monitoring services included horse appraisals, inspections, loan documentation (including UCC filings and Jockey Club certifications) and coordinating matters with insurance companies, auction companies and horse trainers.

Prior to 1987, the partnership's two primary lenders were Citibank, N.A. ("Citibank") and Barnett Bank of Ocala ("Barnett"). Citibank employed Thoroughbred Equity Company ("TECO") to appraise the horses of Happy Valley Farm and to document and monitor the loans.

Between 1984 and 1987, TECO, through its President, Michael Lischin, also made secured loans to Defendant and his brother. TECO conducted lien searches and appraisals on the horses that were security for these loans.

In 1987, Lischin left TECO to become the President of the newly formed Equine Capital Corporation, the Plaintiff in this proceeding. Shortly thereafter the Citibank

and TECO loans went into default. Eventually, inter-creditor agreements were reached between Plaintiff, Citibank, and Barnett allowing for an allocation of Happy Valley Farm's collateral and relative lien priorities. Consequently, Plaintiff replaced Citibank as Happy Valley Farm's primary lender.

Due to the decline of the horse industry generally and horse values, particularly between 1987 and 1989, Plaintiff required additional collateral from Defendant and his brother to protect its secured position. These transactions are summarized as follows:

| Loan | Date | Amount | Collateral |
|---|---|---|---|
| 1) | 11/5/87 | $271,875 | Assignment of Notes payable to Happy Valley Farm from H.V. Farms, Ltd. |
| 2) | 11/6/87 | $1,000,000 | Security interest in certain horses. |
| 3) | 12/23/87 | $2,500,000 | Blanket lien security interest in all Happy Valley Farm's horses and interests in horses. |
| 4) | 5/4/88 | $2,000,000 | Security interest in certain Happy Valley Farm's horses and interests in horses. |
| 5) | 6/29/88 | $600,000 | Harbor View Farm lifetime breeding right to Alydar. |
| 6) | 2/21/89 | $2,400,000 | Blanket lien security interest in all of Happy Valley Farm's horses and interests in horses (including an assignment of proceeds) and mortgage lien on farm. |
| 7) | 2/21/89 | $1,800,000 | Same collateral as (6). |
| 8) | 2/21/89 | $900,000 | Same collateral as (6). |
| 9) | 2/21/89 | $500,000 | Same collateral as (6). |
| 10) | 10/6/89 | $150,000 | Mortgages on two residence in Saratoga Springs, NY. |

The first five loans have been paid either directly or through renewal. The remaining five loans are in foreclosure.

Defendant entered into each of the loan transactions as general partner of Happy Valley Farm. In addition, he is liable for the debts as an individual co-maker on each of the obligations.

Between 1987 and 1990, Happy Valley Farm deposited all proceeds into its general business account and paid Plaintiff monthly. Sums due but not available for payment at the end of the month were added to the total indebtedness for future payment. Plaintiff did not object to this arrangement.

In June of 1989, Plaintiff assigned the notes to its lender, Citizens Fidelity Bank ("Citizens"), as collateral for its debts. At the time, Plaintiff advised Citizens that the loan to collateral value ratio of the underlying debt did not exceed 60% and that the collateral value was supported by Plaintiff's own appraisals.

On February 5, 1990, Plaintiff declared the Happy Valley Farm loans to be in default due to the non-payment of principal and interest. In March of 1990, Happy Valley Farm terminated its business operations and surrendered its assets, including horses, to Plaintiff.

On March 5, 1990, Defendant filed a voluntary petition under chapter 7 of the Bankruptcy Code.

Plaintiff subsequently advised Citizens that the collateral was insufficient to cover the assigned Wolfson notes. In a memorandum from Lischin to Jim Fahy dated March 21, 1990, Plaintiff's President explains:

> The basic problem seems to be that I overvalued the ability of the borrowers to continue to market their horses and their stallions like they had done over their previous twenty years in the horse business.... The past three years they had very poor results at the racetrack and this combined with the dramatic downturn in Ocala and some poor marketing and management decisions led to the financial problems.

On June 28, 1990, Plaintiff commenced this adversary proceeding alleging twelve counts of fraud and misconduct and prayed for its debt to be excepted from Defendant's discharge.

As of May 1, 1992, after taking into account all credits for the disposition of collateral, Defendant and Happy Valley Farm owe Plaintiff $5,120,058.00 in principal and accrued interest. The estimated value of the remaining collateral is $307,500.00.

### Conclusions of Law

■ Section 523 outlines various grounds for excepting a debt from discharge. These provisions are designed to prevent the dishonest debtor from using

the bankruptcy process to avoid the consequences of wrongful conduct. A creditor seeking to except a debt from discharge bears the burden of proof as to each particular element through a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

**A. § 523(a)(2)(A)—Fraud**

■ Section 523(a)(2)(A) provides in relevant part:

(a) A discharge under ... this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud....

To prevail on a claim under this section, a creditor must show the following:

(i) the debtor made a false representation with the purpose and intention of deceiving the creditor;

(ii) the creditor relied on such representation;

(iii) his reliance was reasonably founded; and

(iv) the creditor sustained a loss as a result of the representation.

*In re Graham,* 122 B.R. 447, 450 (Bankr. M.D.Fla.1990); *In re Hunter,* 780 F.2d 1577, 1579 (11th Cir.1986).

**1. *Count I***

■ In Count I Plaintiff alleges that Defendant fraudulently represented that certain collateral was not encumbered by prior liens. Specifically, the evidence showed that three items of collateral were subject to liens held by Barnett: (a) Garthorn Share 14; (b) 1972 Katonka, and (c) 1987 Beneath My Wings.

However, the evidence also demonstrated that "double collateralization" is common in the horse industry, even when the parties are acting in good faith. The mistakes as to the lien status of various pieces of collateral were not proven to be intentional misrepresentations made by Defendant in order to deceive Plaintiff.

In addition, Plaintiff conducted it own investigation of the lien status of all collateral and, as a result, prepared the schedules of collateral attached to its security agreements dated December 23, 1987, and February 21, 1989. Thus, any representation concerning the lien status of the collateral made by Defendant was not relied upon by Plaintiff.

Having failed to meet its burden on two of the elements, Plaintiff's claim under Count I must fail and the Court need not consider the other elements.

**2. *Count II***

■ Count II of the Complaint involves the sale of horses to the Golden Wolf Partnership. In April of 1989, Happy Valley Farm represented to Plaintiff that four horses covered by its security interests: *Over the Rainbow, Time Heals All, Leprechaun Lyn,* and *My Prayer,* had a total value of $215,000.00. Defendant sought the release of the four horses for sale at that total price. Plaintiff consented to the sale with the understanding that the transaction was to be at arm's length for $215,000.00 and the proceeds would be divided seventy percent to Plaintiff and thirty percent to Happy Valley Farm.

In late March of 1989, Defendant approached his college friend Steve Wynn about the possibility of his investing in a racing partnership. Wynn agreed to provide $500,000.00 to assist Defendant with his financial difficulties and by federal express delivered a check for that amount.

Defendant transferred two horses from Barnett's collateral package and the four from Plaintiff's collateral package to the Golden Wolf partnership. The purchase of the six horses was accomplished with the funds received from Wynn. The transfers were made with the consent of the respective lenders and the appropriate release prices were paid.

The Golden Wolf partnership was originally formed by Gary Wolfson, Wynn and Defendant. Subsequently, the wives of Defendant and Gary Wolfson were substituted as partners with Wynn.

The evidence indicates that the fair market value of the four horses in which Plaintiff had an interest was $215,000.00. The release prices established by Plaintiff were based upon its own estimates of the market value of the horses. In addition, the testimony at trial confirmed that the prices received by Happy Valley Farm for the horses were equivalent to the market values.

Plaintiff places great emphasis on the $500,000.00 contribution made by Wynn in arguing that the true sales prices of the horses were different. However, there is no evidence that the monies supplied by Wynn were intended solely to fund the purchase of the six horses. Rather, the indication is that at least a portion of the monies were to be used as working capital.

Having concluded that the sale was for fair market value, Defendant's failure to inform Plaintiff that the sale was to a partnership in which he, at the very least, had a tangential interest through his wife was negligible. Plaintiff released its horses based on its own assessment of their value and the omission, although a misrepresentation, did not cause Plaintiff to sustain a loss. Accordingly, Plaintiff failed to meet its burden on the final element and cannot prevail on Count II.

### 3. *Count III*

Count III of the Complaint involves the pledge of breeding rights to the horse *Alydar*. Plaintiff contends that Defendant used such rights as collateral for the loans made by Plaintiff. However, Defendant's father was the actual owner of the horse and became enmeshed in a legal battle with Plaintiff over such breeding rights. The Plaintiff charges that in settling the dispute with Defendant's father it sustained a loss.

The evidence propounded at trial did not address the allegations of Count III. Having failed to present evidence to support this Count, Plaintiff has not met its burden and the claim must fail.

### 4. *Count IV*

Count IV of the Complaint concerns a loan made by Plaintiff to enable Happy Valley Farm to purchase the mare *Ed's Lori* and its foals from Leonard and Evelyn Sacks. The horses had a value of $130,000.00 and Plaintiff agreed to advance $78,000.00 (60% of the value).

The Sacks owed Happy Valley Farm approximately $74,000.00 for board fees. The $130,000.00 purchase was offset by that amount, leaving approximately a balance of $56,000.00. The Sacks agreed to a $28,000.00 payment at the time of the sale and to take an unsecured note for the balance due of approximately $28,000.00.

Plaintiff argues that Defendant failed to disclose both the $74,000.00 set-off and the unsecured note. Thus, it maintains that only $28,000.00 of the loan was used for the stated purpose and the remaining $50,000.00 was utilized by Defendant for his own purposes. Consequently, it believes the funds were obtained by misrepresentation and the underlying debt should be nondischargeable.

The evidence failed to establish that Defendant made any misrepresentation concerning the loan or that Defendant failed to disclose a material fact. No proof was offered indicating that the loan proceeds were to be used exclusively for the purchase of these horses.

Nor was any evidence presented that the circumstances of the transaction have harmed Plaintiff. The set-off amounts to nothing more than a payment by Defendant to the Sacks followed by a direct payment from those same funds by the Sacks to Defendant for the outstanding board fees. In addition, the proof failed to demonstrate that the $28,000.00 unsecured note given to the Sacks in any manner caused prejudice to Plaintiff's rights. Plaintiff's interest in the horses remained intact regardless of the note given by Defendant to the Sacks for the unpaid purchase price.

Having failed to meet its burden on both the misrepresentation and the damages elements of Count IV, the Plaintiff's claim must fail.

### 5. *Count V*

The fifth Count of the Complaint concerns a $900,000.00 loan made by Plain-

tiff to Happy Valley Farm in connection with the loan restructure. Three hundred thousand dollars of the funds were to be used to pay past due principal and interest and the remaining monies were to be used by Happy Valley Farm as working capital to pay other creditors.

Plaintiff contends that the proceeds were only to be used to satisfy liens that potentially could take priority over its liens. Thus, it claims that $139,530.00 of the loan funds were not used to pay senior lien holders and were fraudulently obtained.

Neither the loan agreement nor the security agreement executed in connection with the loan make any reference to the specific allocation of the loan proceeds. The evidence presented indicated that the proceeds were used to pay trade creditors, but not necessarily only those with liens senior to Plaintiff's. In addition, Defendant testified that he never represented to Plaintiff that such a payment scheme would occur.

Even if Plaintiff could prove that Defendant did not use $139,530 of the loan funds to pay senior trade creditors, Plaintiff has failed to prove that it sustained a loss as a result of the alleged misuse of funds. Specifically, no evidence was presented as to which trade creditors holding liens were not paid and how, if at all, Plaintiff sustained a loss with respect to such unpaid lien. Therefore, any loss is speculative at best and cannot be excepted from Defendant's discharge. *In re Reynolds*, 122 B.R. 455, 458 (Bankr.M.D.Fla.1990).

Accordingly, the Plaintiff has failed to carry its burden of proof on the misrepresentation and the damages elements of Count V and this claim must fail.

**B. § 523(a)(6)—Willful and Malicious Injury**

Section 523(a)(6) provides in relevant part:

(a) A discharge under ... this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity....

Willful and malicious injury under § 523(a)(6) includes conversion, which is the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights. *In re Van Loan*, 114 B.R. 760, 762 (Bankr.M.D.Fla.1990). A showing of specific intent is not necessary and, as long as there has been a deliberate, unjustified act causing an injury, sufficient grounds for a finding of willful and malicious injury exist. *Id.* Thus, the willful sale of collateral and reckless disregard of a secured creditor's rights, even in the absence of fraud or malice, falls within the exception to discharge found in § 523(a)(6).

### 1. Count VI

Count VI of the Complaint alleges that Plaintiff had a security in horses, stallion shares, breeding seasons, foals, and race proceeds, which Defendant routinely and systematically converted to his and Happy Valley Farm's use.

The evidence shows that Defendant is well-educated and an experienced businessman. He attended the Wharton School of Finance and was the Chief Executive Officer of an American Stock Exchange company. He had the knowledge and expertise to understand his obligations and limitations in connection with the sale and disposition of collateral under the security agreements. In a memorandum to his brother dated April 21, 1988, he stated:

In almost all lending agreements (including, of course, Citibank and ECC), borrower agrees that no asset owned now *or in the future* may be utilized (hypothecated, sold, etc.) without consent of lender. *So*, if we got LOST CODE or a $1,000,000.00 horse as a gift, no disposition can be made as the current lender has in effect a lien, or security interest. (Emphasis in original)

The evidence established that for the years 1988–1990 Happy Valley Farm received the following income:

| | |
|---|---|
| 1) race winnings | $1,490,798.00 |
| 2) sale of stallion seasons | $1,062,595.00 |
| 3) sale of mares, stallion shares, and horses pledged as collateral to Plaintiff | $2,095,348.00 |
| 4) sale of foals pledged to Plaintiff | $ 694,997.00 |
| TOTAL | $5,343,738.00. |

In addition, Plaintiff claims that Happy Valley Farm also received $383,334.00 in 1989 from the sale of the Golden Wolf Partnership horses, thus bringing the total to $5,727,072.00. Of this total amount, Plaintiff claims that Defendant and Happy Valley Farm were entitled to retain $1,224,189.00 and were to remit the balance of $4,502,883.00 to Plaintiff. Only $2,303,744.00 was paid to Plaintiff.

The security agreements between the parties required Defendant and Happy Valley Farm to obtain approval for any sale and then to pay Plaintiff various percentages of the sale price. The evidence demonstrates that the collateral was often sold without the requisite approval and the appropriate percentages frequently were not applied nor remitted to Plaintiff.

In fact Defendant testified that he was aware that collateral was sold and race winnings were received without appropriate payment to Plaintiff. He stated that when monies were received, the funds were deposited into the business general account. Payments were made to Plaintiff at a regular interval and if the funds were not available at that time, the balance was carried forward. Thus, the proceeds were used to pay general expenses of the business and were not always available for disbursement to Plaintiff.

In addition, Happy Valley Farm's financial officer wrote a memorandum to Defendant and his brother on January 26, 1990, bringing to their attention the impropriety of selling collateral without approval, stating: "What took place today is legally wrong—taking money from the sale of secured collateral without the approval of the lienholder." Defendant acknowledged in return correspondence that the proceeds from the sale of collateral had taken place for many months. However, he asserted that such action was justified because it had been done in the past and because Plaintiff had been unfair.

■ This Court has held that the sale of collateral without the consent of the lienholder amounts to a willful and malicious injury warranting exception of the underlying debt from the debtor's discharge. *In*

*re Muto*, 124 B.R. 610, 611 (Bankr.M.D.Fla. 1991). Defendant's contention that his conduct was justified because he believed he had the right to take such action is misplaced. *See In re Thomas*, 116 B.R. 287, 290 (Bankr.M.D.Fla.1990).

Although Plaintiff's continued renewal and extension of credit to Defendant may have constituted a questionable business decision, its forbearance and liberal latitude does not excuse Defendant's conversion of collateral. In *In re Sindic*, 44 B.R. 167 (Bankr.E.D.Wis.1984), the creditor admitted that it did not diligently supervise the debtor's account. However, the Court found that such latitude did not excuse the debtor's conversion of the collateral, which constituted a willful and malicious act. The Court held that the debt was nondischargeable pursuant to § 523(a)(6). *Id.* at 171–72.

The evidence shows that Defendant had full knowledge of his and the company's responsibilities under the security agreements. The retention of proceeds which should have been remitted to Plaintiff was done deliberately and without justification. Accordingly, the Defendant committed a willful and malicious act that caused injury to Plaintiff.

The extent of the injury can be determined by reference to the summary exhibits. Plaintiff's exhibit 135 summarizes the income received by Happy Valley Farm from 1988 through 1990. The Certified Public Accountant who testified in connection with this exhibit stated the business received total proceeds of $5,727,072.00 and that of such amount only $2,303,744.00 was remitted to Plaintiff. She concluded that Plaintiff was entitled to receive an additional $2,199,139.00 which was not paid.

The summary exhibit includes as income an entry of $383,334.00 for the sale of the Golden Wolf Partnership horses. The figure is based on an argument by Plaintiff concerning the purported value of the horses. The Court has rejected this argument in section A(2) of this opinion (pages 641 and 642). Accordingly, such sum will be stricken from consideration on this issue. Thus, the total proceeds to the business

equals $5,343,738.00. Of that amount, Happy Valley Farm was entitled to retain $1,224,189.00 and Plaintiff to receive $2,303,744.00. The difference of $1,815,-805.00 was converted by Defendant and supports a finding of an exception to discharge.

### 2. *Count VII*

Count VII of the Complaint involves an allegation that Defendant granted bonus seasons in the Garthorn Syndicate in a manner favoring himself and Happy Valley Farm. Plaintiff held stallion shares in the syndicate as collateral. Plaintiff alleged that Happy Valley Farm was the syndicate manager and in his capacity as general partner of the business, Defendant awarded the bonus seasons. By not making the awards on an equal basis, Count VII asserts that Defendant caused damage to Plaintiff.

The evidence offered at trial did not address the allegations of Count VII. Having failed to present evidence to support this count, Plaintiff has not met its burden and the claim must fail.

### 3. *Count VIII*

Plaintiff bases Count VIII on the same facts that were utilized in Count II. Having found in part A(2) of the opinion (page 8) that the sale was for fair market value, the Court cannot now conclude that there was a willful or malicious injury. The evidence established that Defendant remitted the appropriate proceeds to Plaintiff based on the sales price. In addition, the Plaintiff consented to the sale provided the release prices were paid. Since Defendant committed no unauthorized act, no conversion occurred and Plaintiff's claim under this Count must fail.

### 4. *Count IX*

Count IX of the Complaint involves a horse named *Give Me Strength*, in which Plaintiff had a security interest. Plaintiff alleges that Defendant moved the horse to a different farm with knowledge that such move would permit the receiving farm to claim a lien superior to the interest of the Plaintiff in the collateral.

The evidence propounded at trial did not address the allegations of Count IX. Having failed to present evidence to support this count, Plaintiff has not met its burden and the claim must fail.

### 5. *Count X*

In Count X of the Complaint, Plaintiff alleges that Defendant permitted the horses to be raced too often which caused a decline in the value of such horses. Plaintiff argues that since the horses also served as collateral for Plaintiff's loan, the decrease in value of the horses adversely impacted on its security and caused damage to the Plaintiff.

The evidence at trial did not address the allegations of Count X. Having failed to present evidence to support this count, Plaintiff has not met its burden and the claim must fail.

### 6. *Count XI*

Count XI of the Complaint concerns an alleged breach of fiduciary duty to syndicate members by Defendant. It is alleged that Defendant collected expense money from the members and converted the funds. Among the syndicates for which Happy Valley Farm served as manager were those owning stallions, shares of which were pledged to Plaintiff. Plaintiff claims that as a result of the conversion various stallions have not been properly nominated to the Breeders Cup Awards program resulting in diminution in their value and a loss of Breeders Cup awards. In addition, the failure to use the proceeds to pay for expenses resulted in the assertion of prior liens by the parties providing care for the horses.

The evidence at trial did not address the allegations of Count VII. Having failed to present evidence to support this count, Plaintiff has not met its burden and the claim must fail.

### C. § 523(a)(2)(B)—False Financial Statements

The twelfth count contains an allegation that the financial statements submitted to Plaintiff by Defendant were false, thus dictating that all outstanding debts to Plain-

tiff should be excepted from Defendant's discharge. Section 523(a)(2)(B) provides in relevant part:

(a) A discharge under ... this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive....

On September 30, 1987, Defendant submitted a financial statement to Plaintiff showing Happy Valley Farm to be worth $14,000,000.00. Plaintiff claims that it relied on this statement when making the loans to the business in November and December of 1987. Plaintiff further contends that the statement was false when made.

On October 29, 1987, Defendant wrote a letter to his father admitting that Happy Valley Farm was overextended. However, the letter also discusses a meeting the day before at which time Defendant learned that he was not going to receive certain financing that he and the business had expected.

■ In order to prevail on this Count, the Plaintiff has to prove more than a mere inaccuracy in the writing, there must have been a "material falsity." *In re Wing*, 96 B.R. 369, 372 (Bankr.M.D.Fla.1989). The evidence indicates that the values Defendant assigned to the business were based on the value of the horses, realty, and buildings associated with Happy Valley Farm.

With respect to the horses, Defendant testified that his valuations were based upon an internal appraisal process and then verified against the independent appraisals conducted by Fasig–Tipton, Inc., Plaintiff, and others. In addition, horse values were

decreasing between 1986 and 1989, with a significant decline occurring in 1987.

With respect to the realty and buildings that comprised the farm, Defendant testified that each of Happy Valley Farm's valuations were based on independent appraisals obtained by or on behalf of its lenders. He also stated that the value of the farm declined along with the economic decline of the horse industry.

The letter to Defendant's father indicates that when written Defendant and the business were experiencing financial difficulties. However, the problems appear to have surfaced following a meeting with the lenders the day before the letter was written. No evidence was presented to show that such difficulties existed at the time the financial statement was submitted.

■ The greater weight of the evidence establishes that the financial statement provided by Defendant was not materially false. Accordingly, Plaintiff failed to prove the first element under § 523(a)(2)(B).

The financial statement clearly concerned Defendant's financial condition thus, the second condition of § 523(a)(2)(B) has been met.

The next element that must be considered is whether the Plaintiff reasonably relied on the financial statements. The evidence shows that Plaintiff was an asset based lender, generally making secured loans with a maximum loan to value ratio of 60%. Plaintiff confirmed the value of the farm with other lenders and routinely conducted appraisals of the horses. In addition, Plaintiff, through its president, had a long term relationship with Defendant and Happy Valley Farm during which time it became very aware of the financial condition of both entities. Consequently, the Court concludes that any reliance that Plaintiff placed on the financial statements was insignificant and the third element of § 523(a)(2)(B) has not been satisfied.

The final element, intent to deceive, can be inferred from the surrounding circumstances. *In re Wing*, 96 B.R. at 372. "[W]here a person knowingly or recklessly

makes a false representation which the person knows or should know will induce another to make a loan, intent to deceive may be logically inferred." *Id.* at 373.

In this proceeding, the Court finds that Defendant made a good faith attempt to provide accurate information in his financial statement. No evidence of an intent to deceive is present. Accordingly, Plaintiff has also failed to satisfy this element.

Having failed to prove three of the four elements required for a finding of non-dischargeability under § 523(a)(2)(B), Plaintiff cannot prevail on this claim.

### D. Defendant's Additional Arguments

In his post-trial brief, Defendant asserts for the first time that Plaintiff has no valid claim under state law which can be excepted from discharge. Defendant argues that under Kentucky law a secured creditor must give a debtor written notice of the sale of collateral or any claim for deficiency is forfeited. Defendant maintains that since he never received such notice, Plaintiff has forfeited any claim that might be excepted from discharge.

The Court finds that such position was not properly raised at trial and declines to rule on the merits of such allegations.

### E. Conclusion

The Plaintiff has failed to prove the elements of an exception to discharge under § 523(a)(2)(A) for Counts I, II, III, IV, and V; under § 523(a)(6) for Counts VII, VIII, IX, X, and XI; and under § 523(a)(2)(A) for Count XII. However, Plaintiff met its burden under § 523(a)(6) with respect to Count VI and the resulting debt of $1,815,805.00 will be excepted from Defendant's discharge.

A separate Judgement in accordance with these Findings of Fact and Conclusions of Law will be entered.