**Fred Stanton SMITH, as Trustee of the Miami Center Liquidating Trust, Plaintiff,**

v.

**The BANK OF NEW YORK, United States of America, Miami Center Limited Partnership, Chopin Associates, Holywell Corporation, Theodore B. Gould, and Miami Center Corporation, Defendants.**

Bankruptcy Nos. 84–01590–BKC–SMW, 84–01591–BKC–SMW, 84–01592–BKC–SMW, 84–01593–BKC–SMW and 84–01594–BKC–SMW.
Adv. No. 87–0627–BKC–SMW–A.

United States Bankruptcy Court, S.D. Florida.

Sept. 24, 1993.

## FINDINGS OF FACT AND CONCLU-SIONS OF LAW AS TO TRUSTEE'S CLAIMS AGAINST THE BANK OF NEW YORK

SIDNEY M. WEAVER, Chief Judge.

This cause came before the court on June 21–22, 1993 for trial on Counts I and II of the Trustee's Amended Adversary Complaint against The Bank of New York. The Trustee seeks recovery both for negligent misrepresentations made by the bank and for enforcement of the indemnity agreement in favor of the Trustee. The court having heard and considered the testimony of witnesses and having reviewed the evidence admitted, having heard argument of counsel, and being otherwise fully advised in the premises, does hereby make the following findings of fact and conclusions of law.

### FACTS

The Bank of New York ("bank") was the construction lender on the Miami Center project, which consisted of a hotel, office building, parking garage and shopping podium in downtown Miami. In July 1984, the bank initiated foreclosure proceedings in Dade

County, Florida against the developers. One month later, the developers—Theodore B. Gould and four companies he owned, controlled and dominated[1]—filed simultaneous voluntary Chapter 11 petitions in this court.

Shortly thereafter, the debtors sought the court's permission to consummate the sale to a third party of what is commonly referred to as the Washington properties. The court granted the request and closings occurred in late December 1984 and early January 1985. By order dated December 11, 1984, the court directed the debtors to deposit the proceeds into a segregated account subject to further court order. C.P. 257. These proceeds were deposited without establishing a reserve for payment of income taxes.[2]

The bank filed an emergency motion to treat the *net* proceeds from the sale of the Washington properties as cash collateral which secured, in part, the loan on the Miami Center project, and to both segregate and account for this cash collateral. The court granted this motion by order dated December 31, 1984.

Both the bank and the debtors-in-possession thereafter filed competing disclosure statements and reorganization plans. The primary features of the bank's plan were:

* the creation of the Miami Center Liquidating Trust, consisting of all of the debtors' assets as defined by Bankruptcy Code § 541(a)

* the appointment of a trustee to administer the trust upon confirmation

* substantive consolidation of the debtors' assets and liabilities[3]

* the sale of the Miami Center to the bank or its nominee for $255.6 million, a price supported by an MAI appraisal.

The assets of the Trust also included, *inter alia*, the gross proceeds from the sale of the Washington properties (even though the order on the bank's cash collateral lien extended only to the net proceeds), and the debtors' stock and partnership interests in one another and in numerous wholly-owned and affiliated non-debtor entities.

The bank's disclosure statement and plan and its amended disclosure statement and amended plan failed to include any analysis of the state and federal tax consequences of consummation of the plan. The bank also failed to address these consequences at confirmation or in the detailed order of confirmation entered after remand.

The debtors' plan did contain a reference to federal taxes. It also called for the sale of the Miami Center and the use of the proceeds from the sale of the Washington properties to pay creditors.

At a hearing before this court on the bank's motion for substantive consolidation, the debtors objected on the ground that adverse tax consequences would result from the entry of such an order. The court invited the debtors to present evidence in support of their objection, and expressed a willingness to permit modification of the bank's proposed plan in order to avoid unnecessary taxes.[4] Nonetheless, neither the debtors nor the

---

1. Holywell Corporation, Miami Center Corporation, Chopin Associates, and Miami Center Limited Partnership.

2. The debtors' accountant, Touche Ross & Co., prepared a report shortly thereafter showing the distribution of the sale proceeds to the selling entities subject to federal income tax liabilities, if any.

3. This feature was ultimately modified prior to confirmation in response to objections filed by debtor Holywell's creditors' committee. As modified, these creditors were to be paid first from Holywell's assets before those assets were used to pay the creditors of the remaining debtors.

4. Bankruptcy Judge Thomas C. Britton stated, C.P. 534:

> The last point I want to touch on are [sic] the tax consequences. In this area, I readily concede that I am a babe in the woods and haven't the foggiest notion of what the tax consequences would be on the particular decision. If a modification of this plan or any other adjustment can be made to alleviate adverse tax consequences for the debtors, then I think that a request for such a modification ought to be respected and honored, and I would so as long as I have the discretion to do so intend to accomplish that result.
>
> I think that all of us have recognized in our discussion that there might be tax consequences. We are not certain if we have considered all that we could do to alleviate the adverse tax consequences.

bank presented any evidence of the tax consequences of the bank's plan, and neither party sought modification of the bank's plan in order to reduce any such tax obligations.

The creditors overwhelmingly voted in favor of the bank's plan and on August 8, 1985, the court confirmed the bank's plan. Fred Stanton Smith was appointed Trustee of the Miami Center Liquidating Trust several days later and, prior to the effective date, began limited preparation for the sale of the Miami Center.

At the closing on the sale of the Miami Center, the Trustee demanded and the bank provided an agreement by which the bank undertook to indemnify the Trustee "for any claims against said Liquidating Trustee, as a result of execution of the Contract [of Sale of the Miami Center] in the manner set forth in the above-quoted provisions or any other provision of the plan."

The wording of the indemnity agreement itself and the more credible testimony presented at trial as to the parties' intentions make clear that the bank agreed to indemnify the Trustee for any liability incurred as a result of implementation of the plan, including tax obligations imposed by law upon the Trustee.

The plan became effective and the sale of the Miami Center closed on October 10, 1985.[5] The Trustee thereupon promptly commenced administration of the Trust and, as required by the plan, paid most unsecured creditors almost immediately after the effective date even though there was no provision for taxes. The plan required the Trustee to pay virtually all creditors even before the tax return for Holywell Corp. and Subsidiaries would be due.

The debtors' appeal of the plan was unsuccessful. The district court affirmed the order of confirmation after remand, and the court of appeals ordered the appeal dismissed as moot because the plan had been substantially consummated. *See Holywell Corp. v. Bank of New York,* 59 B.R. 340 (S.D.Fla.1986), *dismissed as moot. sub nom., Miami Center Ltd. Ptnshp. v. Bank of New York,* 838 F.2d 1547 (11th Cir.), *cert. denied,* 488 U.S. 823, 109 S.Ct. 69, 102 L.Ed.2d 46 (1988).

From the time of the August 1985 order of confirmation until mid–1987, the debtors and their accountants repeatedly advised the Trustee that the debtors would file all of the required tax returns and would be responsible for payment of the taxes.

At trial the bank presented no evidence that it conducted any investigation, either before or after confirmation, concerning the tax consequences of its reorganization scheme. The testimony of both the bank officer responsible for the loan and of the bank attorney involved in drafting the plan and in handling the closing was that the bank simply never considered the tax consequences and therefore did not provide for the payment of taxes in the plan. After the debtors demanded the Trustee pay the taxes incurred as a result of the sale, and after the Internal Revenue Service made demand for the filing of tax returns, the Trustee filed an adversary complaint in this court on December 27, 1987 seeking a declaratory judgment on the question of the liability of the Trust to file returns and pay taxes and, if taxes were found to be a Trust responsibility, for recovery against the bank for all of such sums.

This court, the district court and the court of appeals all ruled the Trustee was not responsible for the tax consequences of the plan and, therefore, never reached the question of the bank's liability.[6] The United States Supreme Court reversed, however, and held the Trust was liable for the payment of taxes in accordance with 26 U.S.C. § 6012(b)(3), (4) even though the plan of reorganization did not require him to pay taxes. *See Holywell Corp. v. Smith,* — U.S. ——, 112 S.Ct. 1021, 117 L.Ed.2d 196 (1992).

On remand from the Supreme Court, the Trustee filed an amended adversary complaint seeking a determination of the amount

---

**5.** The debtors appealed the confirmation order but had not posted a bond to stay implementation of the plan during the appeal.

**6.** *See Smith v. United States,* 85 B.R. 898 (Bankr. S.D.Fla.1988), *aff'd,* No. 88–0795 slip op. (S.D.Fla. July 30, 1989), *aff'd,* 911 F.2d 1539 (11th Cir.1990).

and priority of the taxes due the Internal Revenue Service and recovery against the bank for both negligent misrepresentation and enforcement of the indemnity agreement.[7] Debtors Gould and Holywell filed cross-claims against the bank for intentional misrepresentation and fraud, negligent misrepresentation; and conspiracy to injure another in a trade, practice or profession, and counterclaims against the Trustee for gross negligence, breach of fiduciary duty, and conspiracy to injure another in a trade, practice or profession.

Prior to trial the court bifurcated the issues of liability and damages and tried the case on liability only. Accordingly, these findings and conclusions are limited solely to the Trustee's claims of liability against the bank. A separate determination of damages as to the liability of the bank to the Trustee will be made at a later date, and a separate judgment will be entered on the debtors' cross-claims against the bank and counterclaims against the Trustee.

The court notes that it has approved settlements of tax claims asserted against the Miami Center Liquidating Trust by the Commonwealth of Virginia and the State of Florida, for $2 million and $500,000, respectively, and that the Trustee and the United States have reached a settlement of the amount of taxes owed the federal government, approval of which is set for hearing on September 21, 1993. The Trust has sufficient funds on hand to pay all of these taxes. It appears the Trust does not have sufficient assets, however, to pay all of the claims asserted against it in addition to the taxes.

### JURISDICTION

This court has jurisdiction over the bank and the Trustee's claims against the bank, pursuant to Article XIV of the plan of reorganization, 28 U.S.C. §§ 157 and 1334(a), and Rule of Bankruptcy Procedure § 7001(1).

### CONCLUSIONS OF LAW

Upon the foregoing, the court finds the bank is liable to the Trustee for the taxes incurred as a result of the plan of reorganization under the indemnity agreement dated October 10, 1985, and by reason of having made negligent representations in the amended plan and disclosure statement with respect to the tax consequences of the plan.

#### A. *Indemnity Agreement*

■ The court finds the October 10, 1985 indemnity agreement is neither vague nor uncertain. Although the court permitted testimony at trial as to the intention of the parties in entering into that agreement, nevertheless, the court finds the agreement requires no parol evidence to interpret what is plainly stated and intended:[8] the bank agreed to indemnify the Trustee "for any claims against said Liquidating Trustee, as a result of execution of the Contract [of Sale of the Miami Center] in the manner set forth in the above-quoted provisions *or* any other provision of the Plan" (emphasis supplied). A plain reading of this unambiguous wording leads inevitably to the conclusion that the bank agreed to indemnify the Trustee for any consequence of his implementation of the plan of reorganization, including, but not limited to, the tax consequences.

■ When contractual language is clear and unambiguous, as it is in this case, the court may not indulge in a construction or interpretation of the plain meaning of the agreement. *See Rey v. Guy Gannett Pub. Co.*, 766 F.Supp. 1142 (S.D.Fla.1991). Thus, if a contract is clear, the actual language used in the agreement is the best evidence of the parties' intent, and the terms of the contract should be given their plain meaning. *Id.; see also International Erectors, Inc. v. Wilhoit Steel Erectors & Rental Service*, 400 F.2d 465 (5th Cir.1968).

■ To the extent there is an ambiguity in the wording of an agreement, it ordinarily

---

**7.** At trial, the Trustee voluntarily dismissed additional claims brought against the bank for fraudulent misrepresentation, equitable indemnification and breach of contract.

**8.** The evidence of the parties' intent entirely supports the Trustee's contention that the indemnity agreement was designed to indemnify him against anything that might result from consummation of the bank's plan.

must be construed against the party who prepared the agreement. *See McGregor v. Board of Com'rs of Palm Beach County,* 956 F.2d 1017 (11th Cir.1992). In the case *sub judice,* the bank drafted the indemnity agreement specifically to protect the Trustee and to induce him to proceed with the closing. The bank's contention that it never intended to indemnify the Trustee for anything except ordinary warranties of title and like matters arising under the contract for the sale of the Miami Center is not supported by the evidence or the language of the contract. The bank agreed to indemnify the Trustee against *all* claims arising from the sale of the Miami Center and the plan of reorganization. This would obviously include taxes arising as a result of the sale.

For these reasons, the court holds the bank is liable to indemnify the Trustee for all of the tax consequences of the reorganization plan under the October 10, 1985 indemnity agreement, including both state and federal obligations. As previously indicated, the amount of this liability will be determined at a subsequent trial.

### B. *Negligent Misrepresentation.*

 In order to recover for negligent misrepresentation under the law of Florida,[9] the Trustee must have established at trial a misrepresentation or an omission of material fact; knowledge by the bank as to the falsity of the representation or omission, or proof that the representation or omission was made under circumstances in which the bank ought to have known of its falsity; and proof that the Trustee acted in justifiable reliance on the representation or omission. *See C & J Sapp Publishing Co. v. Tandy Corp.,* 585 So.2d 290, 291 (Fla.Ct.App.1990); and *Burton v. Linotype Co.,* 556 So.2d 1126, 1128 (Fla.Ct.App.1989). The Trustee proved each of these elements. As announced at trial, the amount of damage will be determined at a later date.

In this case, there is no dispute that the bank failed to include any analysis of the tax consequences of the proposed reorganization scheme in its disclosure statement or any provision for payment of taxes in its plan. The law requires an analysis of the tax

consequences and provision for payment. *See* 11 U.S.C. § 1129(d). *See also Hall v. Vance,* 887 F.2d 1041, 1043 (10th Cir.1989); *In re Cardinal Congregate I,* 121 B.R. 760, 765 (Bankr.S.D.Ohio 1990); *In re Jeppson,* 66 B.R. 269, 292 (Bankr.D.Utah 1986); *In re Malek,* 35 B.R. 443, 444 (Bankr.E.D.Mich. 1983). The failure to do so is an omission of material fact.

The bank presented no evidence that it investigated the tax consequences of its reorganization plan. Both the bank officer and the attorney responsible for this admitted no provision was made for these consequences because the bank never even considered them. As such, the bank's representations concerning the feasibility of the plan and the Trustee's obligations under the plan were materially false. The court and the creditors acted in total ignorance of such obligations because no tax analysis was included and no provision for payment of taxes was made.

It is clear, of course, that the bank intended the Trustee to rely upon the plan in order to carry out its terms. The court finds the Trustee did rely on the terms of the plan in administering his duties. The court also finds the Trustee's reliance on the disclosure statement and plan was fully justified; 11 U.S.C. § 1142, and that he acted reasonably in carrying out the plan terms.

The court, therefore, concludes that the bank's failure to investigate the tax consequences and the failure to include provision for payment of taxes in the plan constituted negligent misrepresentation for which the bank is responsible to the Trustee.

The court finds and determines The Bank of New York is liable to the Trustee on his claims of negligent misrepresentation and under the terms of the October 10, 1985 indemnity agreement. This order is not intended as a final order. By separate order, the court will set this case for trial on the question of the amount of the Trustee's damages.

DONE AND ORDERED.

---

9. The Trustee seeks relief for common law negligent misrepresentation under state law.