In re Virgil Jerome JONES, Jr., Debtor.

EMERGENCY ONE, INC., a foreign corporation and Federal Signal Corporation, a foreign corporation, Plaintiffs,

v.

Virgil Jerome JONES, Jr., Defendant.

Bankruptcy No. 93–1900–BKC–3P7.
Adv. No. 93–316.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Jan. 3, 1995.

**632**

Lance P. Cohen, Jacksonville, FL, H. Edward Dean, Ocala, FL, for plaintiffs.

Richard A. Perry, Patrick G. Gilligan, Ocala, FL, for debtor/defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This adversary proceeding is before the Court upon complaint filed by plaintiffs, Federal Signal Corporation and its wholly owned subsidiary, Emergency One, Inc., which seeks to except a debt from defendant's discharge pursuant to 11 U.S.C. § 523(a)(2), (a)(4) and (a)(6). The Court held a trial on June 15, July 26, and August 9, 1994, and upon the evidence presented enters these findings of fact and conclusions of law:

### Findings of Fact

Plaintiff, Emergency One, Inc., ("E–One") manufactures fire trucks. In 1980, Dowling Fire Equipment became the exclusive dealer for E–One for the State of Florida. In 1991, Dowling also became the exclusive dealer for E–One in Georgia.

Defendant was the vice-president of Dowling and defendant's father, Jerry "Mike" Jones ("Mike Jones") was president. Although Mike Jones and his wife were the sole shareholders of Dowling and originated the business, Mike Jones testified that at the time in question defendant controlled the financial aspects of the business and he, Mike Jones, worked solely as a salesman for the Georgia territory. Defendant testified, however, that if a problem arose in the financial area he would consult his father.

As the exclusive dealer for Florida and Georgia, Dowling entered into a dealer sales and service agreement with E–One. Paragraph 6 of the dealer sales and service agreement states in part:

> [u]nless otherwise agreed in writing, all shipments shall be made F.O.B. Ocala, Florida, and terms of payment shall be C.O.D. plant. The Company, at its sole discretion, assuming the Dealer meets the financial requirements set forth by the Company and the proper documents are on file, may grant open account status....

Paragraph 2 states in part:

> Dealer agrees to use Dealer's best efforts in the promotion and sale of products in order to achieve sales objectives and market penetration within Dealer's Trade Area satisfactory to Company. Dealer further agrees to maintain at all times a high standard of service in Dealer's Trade Area. In order to carry out these responsibilities, Dealer agrees to: (c) participate in Company's advertising and sales promotion programs.

Sales by Dowling were usually the result of competitive bids. If Dowling was the successful bidder, it would place an order with E–One. Dowling was free to set the price of the trucks it sold.

Defendant generally received equipment ordered from E–One on credit. The standard procedure for sales made by Dowling was for it to send an order to E–One who then approved it and shipped the equipment six to nine months after approval. After shipping the equipment to defendant, E–One would invoice, offering a 1% discount for payment in 16 days with full payment due in 30 days.

Because E–One was extending credit to Dowling on various equipment, in March 1988, February 1991, and May 1991, Dowling granted E–One a security interest in:

(1) all collateral hereafter acquired from secured party by debtor and (2) all cash and non-cash proceeds of after-acquired collateral including, but not limited to, checks, drafts, accounts, chattel paper, instruments and documents and (3) all collateral received by Debtor as trade in as security for the payment in full of (a) all existing and future obligations of Debtor to Secured Party arising out of the purchase by Debtor of collateral from Secured Party, and (b) all other obligations and by Debtor to Secured Party whether now existing or hereafter arising:

These agreements applied to both the Florida and Georgia dealerships.

E–One extended a $1.5 million line of credit to Dowling which was also secured by these items. Defendant and his father personally guaranteed Dowling's indebtedness to E–One. In a state court action based upon notes given to E–One by Dowling and personally guaranteed by defendant, the state court held that defendant and Dowling owed E–One $614,939.00 subject to any setoff rights. E–One's security interests were perfected by a timely filed UCC–1.

For a fee, E–One also offered to obtain performance bonds for its dealers. The bonds were obtained through Safeco Insurance Company and were subject to an indemnity agreement between Safeco and plaintiff, Federal Signal. The bonds could be obtained in either the name of the dealer (making the dealer the principal) or E–One. E–One included the cost of the bonds in the invoice sent upon delivery of the equipment.

E–One provided its dealers with performance bond request forms. The request form contained a question regarding the receipt of a trade-in or down payment. E–One had not earlier required documentation to support a dealer's request for a performance bond, but by August 1992, E–One did require that dealers attach an executed contract or some evidence of a commitment to purchase from the end user.

In August, 1992, defendant's father entered a bid to supply the city of Alpharetta, Georgia, with three fire trucks. Defendant received a $10,000.00 price concession from plaintiffs to make the bid more attractive. In addition to the $10,000.00 discount, defendant offered the city a prepayment discount of $54,513.62. This discount was similar to those being offered by E–One and promoted to its dealers through sales bulletins. Defendant offered this discount as a Dowling discount and not through plaintiffs.

The city of Alpharetta required a performance bond from the successful bidder. Defendant submitted a dealer performance bond request to E–One using the performance bond request form. Defendant attached to the performance bond request, in the amount of $973,094.00, a copy of the Alpharetta purchase order which defendant had altered to delete any reference to the prepayment discount. The manufacturing orders for the Alpharetta trucks were also submitted, and E–One accepted the orders.

Defendant testified that he intended to hide the fact that the city of Alpharetta had paid in full and had received a pre-payment discount upon signing the contract from plaintiffs because if plaintiffs knew about the pre-payment they would demand defendant turn the funds over to E–One. Defendant also testified that upon instruction the office staff circled "no" on the bond request form in response to the question whether a downpayment had been made.

Defendant was the successful bidder to supply the Englewood Fire Control District of Florida ("Englewood") fire department with a fire truck. As with the Alpharetta bid, this bid required a performance bond. Defendant again altered the documents sent to support the request for dealer performance bond. Defendant deleted references to altering the contract to reflect pre-payment and to financing the transaction with a lien against the vehicle contained in a letter of intent and memorandum from Englewood. The requested bond amount on the Englewood transaction was $324,265.00. At the time Dowling applied for the bond for the Englewood sale E–One had already accepted the Englewood order.

After the performance bonds approved by E–One were issued to Dowling, Dowling received executed contracts for the trucks from Alpharetta and Englewood. Both cities paid in full upon executing their contracts. These funds were deposited in Dowling's general business account and used to pay Dowling's creditors, including E–One.

In November, 1992, before the trucks had been manufactured, E–One became aware that Dowling had received the Alpharetta prepayment. Defendant told E–One personnel that the funds were put into a certificate of deposit which was earning interest at a higher rate than that offered through the E–One discount program. E–One then demanded the funds from defendant, but defendant refused.

Defendant then sent a letter to E–One to assure E–One that the funds for the Alpharetta order were still available to pay for the trucks. Defendant's letter indicates that the funds are in defendant's operating account, are subject to a $140,000.00 line of credit and are accruing interest. Defendant altered the bank statement by blocking out five references to the statement date, however, there was one place where the date, September 11, 1992, was left on the statement. Defendant initially testified that this was the result of an oversight and that he intended to delete any reference to the date on the statement. Defendant later testified that he was not trying to hide the date from E–One.

After discovering that Dowling had received the pre-payments from Alpharetta, E–One placed Dowling on a cash basis requiring payment on delivery of equipment and would not invoice Dowling after delivery. Upon being placed on a cash basis, defendant resigned its dealership.

E–One delivered the trucks ordered by Alpharetta and Englewood, thus no demand was made on the performance bonds. E–One has not been paid for the trucks.

### Conclusions of Law

■ The fundamental goal of the bankruptcy code is to provide the honest debtor with a fresh start. *In re Pollitt,* 145 B.R. 353 (Bankr.M.D.Fla.1992). To insure only honest debtors receive the protection of the code, § 523 provides for those circumstances under which certain debts will be excepted from debtor's discharge. Plaintiffs allege that the amount of the performance bonds should be excepted from defendant's discharge under §§ 523(a)(2)(A), (a)(4) and (a)(6).

### § 523(a)(2)(A)

■ Section 523(a)(2)(A) states in relevant part:

A discharge under ... this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud ...

To except a debt from discharge pursuant to § 523(a)(2)(A) plaintiffs must establish, by a preponderance of the evidence, each of the following factors:

(1) the debtor made a false representation with the purpose and intention of deceiving the creditor;

(2) the creditor relied on such representation;

(3) the reliance was reasonably founded; and

(4) the creditor sustained a loss as a result of the representation.

*Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (burden of proof); *In re Hunter,* 780 F.2d 1577 (11th Cir.1986); *In re Graham,* 122 B.R. 447 (Bankr.M.D.Fla.1990).

In this case, plaintiffs argue that defendant's falsification of the performance bond request form and supporting documents and violation of the E–One–Dowling dealer agreement and security agreement constitutes fraud sufficient to except the amount of the requested bonds from defendant's discharge pursuant to § 523(a)(2)(A). Defendant counters that the receipt of the prepayments was confidential business information that he was not required to disclose, and he has not made any misrepresentation within the meaning of § 523(a)(2)(A).

■ For plaintiffs to prevail under § 523(a)(2)(A) debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality. *In re Hunter,* 780 F.2d 1577. Actual fraud may occur when the debtor has willfully concealed or omitted material facts or when he makes intentional statements of half-truths. *In re Pollitt,* 145 B.R. 353; *In re Langworthy,* 121 B.R. 903 (Bankr. M.D.Fla.1990). It is unnecessary that the property or money obtained be procured for the debtor himself, if an officer of a corporation has obtained money or property for the corporation through fraud he will not be shielded by the corporate form. *Id.* at 907. In addition, because direct evidence of intent is rarely available, the Court may infer intent to deceive from the totality of the circumstances in a case. *In re Pollitt,* 145 B.R. 353.

■ Even assuming that, as defendant argues, the dealer agreement did not prohibit defendant's establishing an interest discount program of his own or require the turnover of the pre-payments, and that the term downpayment on the bond performance form was innocently misunderstood by defendant, defendant did not merely fail to disclose information, he actively withheld it by altering documents.

It is clear that defendant intended to deceive E–One. Defendant testified that he intended to prevent E–One from learning that Alpharetta and Englewood had paid in advance for the vehicles. Defendant knew that E–One believed it was entitled to the funds and intended to frustrate E–One in that regard, and defendant intentionally altered the documents presented to E–One with the performance bond requests. When E–One discovered this, defendant continued to deceive plaintiffs by altering the bank statement sent to E–One to document that he still had funds to pay for the Alpharetta order, when in fact, by November, 1992, the funds in Dowling's account were not sufficient to pay for the trucks ordered by Alpharetta. Neither defendant nor his father are credible or believable witnesses. Thus plaintiffs have established the first element required, that is that defendant misrepresented information to E–One in the bond request and that defendant intended to deceive E–One.

■ Plaintiffs approved the issuance of the performance bonds based on the bond request form and supporting documentation from the Englewood and Alpharetta orders. The financial vice-president of E–One testified that he relied solely on this paperwork in making his determination whether to approve a bond. The vice-president also testified that had he known pre-payments had been offered he would have been much more critical in assessing the request and probably would have denied it, because the receipt of pre-payments by the dealer increased the risk to E–One. In addition, in recent years, E–One had changed the bond request forms and procedure by requiring dealers to attach documentation evidencing the buyer's intention to purchase and to indicate whether a downpayment was involved in the transaction. The increased documentation and scrutiny exercised by plaintiffs in evaluating a bond request form supports plaintiffs' contention that it relied upon the information supplied by defendant.

The increased documentation and alteration of the bond request forms also supports the reasonableness of plaintiffs' reliance. In addition to the documentation, E–One relied

upon the long term relationship between itself and Dowling and, in general, the trustworthiness of its dealers.

■ Both the Alpharetta and the Englewood sales were dependent on the issuance of performance bonds. It was not until after E–One approved the performance bonds that each city executed contracts to purchase the trucks with Dowling and paid for the trucks. Defendant's misrepresentation resulted in the issuance of the bonds and the receipt by Dowling of the pre-payment funds.

Because E–One approved issuance of the bonds and the bonds were subject to an indemnity agreement with Safeco, plaintiffs had to choose between delivering the trucks or allowing the bonds to be called when Dowling failed to pay for the trucks. Thus, plaintiffs stood to lose the amount of the bonds or the value of the trucks. E–One delivered the trucks. Dowling has not paid for the equipment because the pre-payment funds were used by defendant and Dowling to pay general corporate expenses, some of which decreased the amount of defendant's personal guaranties with E–One, and to pay bonuses to defendant, his father and other family members. Thus plaintiffs have established the that defendant made a misrepresentation with the intent to deceive plaintiffs, that plaintiffs reasonably relied on the misrepresentation and that plaintiffs sustained a loss because of defendant's misrepresentation. The question which remains is the amount of that loss.

■ Defendant received $908,580.38 from Alpharetta for the three trucks. Defendant testified that he expected to make a $26,-000.00 commission on the sale. Thus the loss to plaintiffs, on the Alpharetta sale, was $882,580.38. Defendant argues that plaintiffs failed to establish the amount of damages because no evidence of the cost of the trucks was presented. It is true that evidence as to the cost of the trucks was lacking, it is also true that plaintiffs delivered the three Alpharetta trucks and the Englewood truck and have not been paid for these vehicles. Thus, the Court finds that plaintiffs have established that it suffered a loss of $882,-580.38 on the Alpharetta delivery which was caused by defendant's misrepresentation in procuring the performance bonds.

No evidence was presented as to the commission defendant expected to receive from the Englewood sale, thus the Court is unable to determine with sufficient certainty the amount of damage plaintiffs suffered on the Englewood sale.

### § 523(a)(4)

■ Plaintiffs next argue that defendant's actions amount to embezzlement or larceny, and pursuant to 11 U.S.C. § 523(a)(4) the debt owed by defendant to plaintiffs should be excepted from defendant's discharge.

■ Embezzlement for purposes of § 523(a)(4) is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *In re Kelley,* 84 B.R. 225, 231 (Bankr.M.D.Fla. 1988) (quoting *Moore v. United States,* 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895)); *In re Rigsby,* 152 B.R. 776 (Bankr. M.D.Fla.1993). To prevail on its embezzlement claim, plaintiffs must show that defendant appropriated funds or property for his own benefit and that he did so with fraudulent intent. *Id.* However, if the relationship of the parties is more in the nature of a debtor-creditor relationship, property that comes to defendant belongs to him and cannot be embezzled. *Id.* at 779.

The Court has previously found that defendant intended to keep plaintiffs from learning that defendant received pre-payment funds from Alpharetta and Englewood. Defendant falsified documents to keep this information from plaintiffs. The Court holds that this is sufficient to establish that defendant possessed fraudulent intent.

■ Although the E–One–Dowling dealer agreement called for payment on delivery, in the ordinary course, defendant received the trucks on credit. Defendant was not required by either the dealer agreement or the security agreements to segregate the funds received on sales. Thus the relationship between plaintiffs and defendant was more in the nature of a debtor-creditor relationship

and defendant's use of the funds did not constitute misappropriation or conversion because the funds belonged to defendant.

■ Larceny is defined as "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to his use without the consent of the owner." *In re Langworthy*, 121 B.R. 903, 907.

Plaintiffs argue that defendant received the pre-payment funds from Alpharetta and Englewood as a result of an unauthorized interest discount program and in violation of the security agreements with plaintiffs. Initially, the Court finds that defendant was not prohibited by the dealer agreement from offering its own sales promotions. Although the dealer agreement states that, as dealer, defendant would use his best efforts to promote plaintiffs' equipment including the use of E–One programs, this does not necessarily preclude the dealer from offering its own promotions. This view is supported not only by the maxim that a contract must be construed against the drafter, *Smith v. Bank of New York*, 161 B.R. 302 (Bankr.S.D.Fla. 1993), but by the fact that defendant was able to set the price of the equipment he sold and regularly used a lease program other than that offered by E–One with E–One's knowledge and approval. Thus, the Court concludes that defendant's offering his own discount program did not violate the dealer agreement.

■ Nor did the receipt of pre-payments violate the security agreement Dowling had with E–One. A security interest in proceeds cannot be created before the interest in the underlying collateral. *See, In re Radice Corp,* 88 B.R. 422 (Bankr.S.D.Fla.1988).

In this case, it is clear that the underlying collateral, the three Alpharetta trucks and the Englewood truck, did not exist at the time defendant received the pre-payments from these orders, thus E–One's security interest could not attach to the funds when they were received by defendant. Consequently, defendant came into possession of the pre-payments rightfully, and defendant's receipt of the funds did not constitute larceny. Plaintiffs have thus failed to establish that defendant's receipt of the pre-payment amounts to either embezzlement or larceny under § 523(a)(4).

### § 523(a)(6)

■ Pursuant to § 523(a)(6) a discharge under § 727 does not discharge a debt "for willful and malicious injury by the debtor to another entity or the property of another entity." 11 U.S.C. § 523(a)(6). Willful and malicious injury under § 523(a)(6) includes conversion which is the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights. *In re Wolfson*, 148 B.R. 638 (Bankr.M.D.Fla.1992). Specific intent is not a necessary element of a malicious injury claim as long as there has been a deliberate, unjustified act which causes injury. *Id.* In addition, the sale of collateral without the consent of the lienholder, in reckless disregard for the secured creditor's rights constitutes willful and malicious injury within the meaning of § 523(a)(6). *Id.; In re Ogden*, 119 B.R. 277 (Bankr.M.D.Fla.1990).

■ The Court holds, with regard to plaintiffs' allegations pursuant to §§ 523(a)(2)(A) and (a)(4), that defendant possessed fraudulent intent in knowingly preventing plaintiffs from learning that defendant received pre-payments from Alpharetta and Englewood. The Court also concludes that defendant's receipt of the funds did not violate either the security agreement or dealer agreement. Defendant did not convert plaintiffs' funds or act in reckless disregard of plaintiffs' rights because he had a right to the funds until the trucks were delivered. Consequently, defendant's actions do not constitute willful and malicious injury under § 523(a)(6).

### Conclusion

Defendant's actions in falsifying documents to induce plaintiffs to procure performance bonds on the Alpharetta and Englewood transactions constitutes a misrepresentation within the meaning of § 523(a)(2)(A) which plaintiffs reasonably relied upon in approving the bonds and suffered damage in the amount of $882,580.00.

Defendant's actions did not constitute embezzlement, larceny or willful and malicious injury to the property of another because defendant had a right to receive the prepayment funds.

The Court will enter a separate judgment consistent with these findings of fact and conclusions of law.