In re Kenneth M. WING and Annette T. Wing, Debtors.

LIBERTY NATIONAL BANK, Plaintiff,

v.

Kenneth M. WING, Defendant.

Bankruptcy No. 86–264–BKC–6P1.
Adv. No. 86–225.

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Feb. 9, 1989.

John A. Baldwin, Orlando, Fla., for plaintiff.

T. Kevin Knight, Orlando, Fla., for defendant.

GEORGE L. PROCTOR, Bankruptcy Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This adversary proceeding is before the Court upon a complaint seeking an exception to discharge pursuant to 11 U.S.C. §§ 523(a)(2)(B) and (a)(4). The trial was held on October 29, 1987, and October 27, 1988. Upon the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

The defendant is a licensed physician practicing in Sanford, Florida. He engages in his profession under the name Wing Surgical, P.A., of which he is the President and sole stockholder.

In addition to his medical practice, defendant is involved in several other business ventures. For instance, he has had an interest in a restaurant in Altamonte Springs, Florida. He has also over the past fifteen years, bought and sold between fifteen and twenty parcels of real estate.

In December of 1981, defendant was invited to become a stockholder and member of the Board of Directors of the newly-formed Liberty National Bank. He accepted the position and continued in that capacity until his resignation in February, 1986.

During his tenure as a director of Liberty National, the defendant often borrowed money on an unsecured basis from the bank. It was the bank's policy to give each director an unsecured line of credit in the amount of $150,000, provided the director maintained a current financial statement on

file. This requirement was formulated primarily to satisfy regulatory concerns rather than to serve as data to support a loan.

On August 23, 1983, the defendant submitted a financial statement to the bank reflecting a net worth of $3,337,141.20. Of this total, $300,000 was listed as cash, $4,274,096.90 as real estate and $75,000 as accounts and notes receivables. The schedules attached to the personal financial statement list a mortgage receivable (Mayfair Shopping Center Note and Mortgage) in the amount of $320,000. Defendant did not disclose that the mortgage had been pledged as security for a loan from Orange National Bank. The schedules further show that defendant received approximately $32,000 to $64,000 per year from the Mayfair Shopping Center Note and Mortgage. The schedules also list two unsecured debts to Liberty National in the amount of $160,000.

A full examination reveals that the information set forth on the financial statement is inaccurate. For example, the subtotal of assets on the left hand side of the column contains a mathematical error in the amount of $675,000. Similarly, the defendant failed to supply any information under the section entitled "Schedule of Income and Contingent Liabilities." As for the $300,000 cash entry on the first financial statement, the evidence indicates that the defendant had only $40,981.03 in cash on hand at the time the statement was prepared. Moreover, $35,000 of this amount was obtained from a loan from Flagship Bank of Seminole County which was not disclosed.

In addition to these errors, the schedules attached to the documents fail to list defendant's monthly mortgage payments and the rental income he receives from all of his real estate holdings. A $35,000 loan owed to Freedom Federal and a $42,589 obligation to his professional association Pension and Profit–Sharing Plan are also omitted.

The documents contain further discrepancies. For instance, the debtor's principal residence in Sanford, Florida, was listed on the August 23, 1983, financial statement as having a value of $500,000 when it was worth approximately $238,000. Similarly, the defendant scheduled his condominium in Hawaii as having a value of $950,000. The evidence shows that the fair market value of the property was closer to $750,000. The same can be said of the "Roberts" property. Although there was no testimony as to the actual value of this parcel, it is apparent to the Court that the defendant assigned an arbitrary value of $1,500,000.

George W. Lange, Jr., Vice–President and Senior Trust Officer of American Pioneer Savings Bank testified on the status of the Wing Surgical, P.A., Pension and Profit–Sharing Plan (the "Plan"). He stated that defendant often borrowed money from the Plan and, as of July 31, 1983, the value of defendant's interest had been reduced to $90,629.00. Mr. Lange also testified that defendant owed the Plan $42,589. The August 23, 1983, financial statement reflected a credit for Pension and Profit–Sharing Funds in the amount of $300,000. The obligations to the Plan were not disclosed.

Prior to his becoming a director in December of 1981, the defendant obtained a loan from Florida National Bank in the amount of $10,000 secured by 3300 shares of Atico Mortgage Investors, Inc.; 200 shares of Florida Cypress Gardens, Inc.; and 100 shares of Key Energy Enterprises, Inc. This loan was increased to $20,000 on June 7, 1984, and 30,320 shares of Liberty National Bank stock was substituted for collateral. This too was not disclosed.

On September 27, 1984, the defendant submitted a second financial statement to plaintiff reflecting a net worth of $2,488,225. Although this financial statement is more complete than the first, it too contains significant errors and omissions. For instance, the value of the Mayfair Shopping Center note is listed as $268,326.88, but again, there was no indication that the note had been pledged as security for a loan. The attached schedules again show that defendant had already exceeded his $150,000 line of credit.

On April 11, 1984, plaintiff made an $80,-000 unsecured loan to defendant. This loan was renewed five times. On May 9, 1984, Liberty National loaned an additional $70,000 to defendant, again on an unsecured basis. This loan was renewed six times. The bank did not have current financial statements on file when the renewal notes were signed. As of October 29, 1987, the first trial day, the outstanding balance on the loans was $184,738.64.

Defendant maintains that he did not prepare the financial statements which were submitted to plaintiff. Instead, he submits that he relied upon office personnel to compile the necessary data. He suggests his practice was to make a "cursory" examination of the financial statements before offering them to lending institutions. He also testified he did not intend for the financial statements to be fully and completely accurate, but was only to provide the bank generally with an estimate of his net worth.

## CONCLUSIONS OF LAW

Count I of plaintiff's complaint is predicated upon § 523(a)(2)(B) of the Bankruptcy Code. That section provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with the intent to deceive.

To support an exception to discharge under § 523(a)(2)(B), the plaintiff must prove by clear and convincing evidence (i) that the financial statement submitted is "materially false," (ii) that it "reasonably relied" upon the statement, (iii) in the "extension, renewal, or refinancing of credit," and that

(iv) the defendant "caused [the statement] to be made or published with the intent to deceive." *In re Figueredo (International Bank of Miami, N.A. v. Figueredo)*, 84 B.R. 856 (Bkrptcy.S.D.Fla.1988); *In re Elliott (Bud Antle, Inc. v. Elliott)*, 93 B.R. 776 (Bkrptcy.M.D.Fla.1988).

■ It is not sufficient under § 523(a)(2)(B) to show that the statement is incorrect in fact, it must be shown to be "materially false." *In re Bogstad*, 779 F.2d 370 (7th Cir.1985). Items of falsity include that the defendant failed to disclose a $35,000 loan from Freedom Federal, a $42,589 obligation to his pension plan, and the fact that the Mayfair Shopping Center Note was pledged as collateral to Orange National Bank in California.

In addition to the non-disclosure of liabilities, the value of defendant's assets was substantially overstated. For example, defendant assigned a value of $500,000 to his residence when actually it was worth only $238,000. Similarly, the defendant stated that the value of his interest in the Pension and Profit–Sharing Plan was $300,000 instead of $90,629. As for the $300,000 in cash listed, the evidence suggests that defendant had only $40,981.03 on hand when the financial statement was prepared, $35,-000 of which was borrowed money. The omission, concealment or understatement of liabilities of this magnitude coupled with the "puffing" of asset values is sufficient to support a finding that the financial statement is materially false.

Secondly, the Court finds that the defendant prepared this statement with the "intent to deceive." Because intent to deceive is often difficult to prove, such intention may be inferred from the surrounding circumstances. A relevant discussion may be found in *Matter of Rickey*, 8 B.R. 860, 863 (Bkrptcy.M.D.Fla.1981):

[I]t is sufficient to show that a false representation on a financial statement was made with actual knowledge that it was incorrect or it was made with reckless indifference and disregard of the actual facts and without examining the available sources which were readily

available and the statement was made without reasonable grounds to believe that the statement was, in fact, correct.

It may be that the defendant did not mean to actually defraud the bank. However where a person knowingly or recklessly makes a false representation which the person knows or should know will induce another to make a loan, intent to deceive may be logically inferred. *In re Magnusson*, 14 B.R. 662, 669 (Bkrptcy.N.D.N.Y. 1981). This inference arises because where one knowingly makes a false statement, he must be held to have intended the natural and necessary consequences of his act. *Id.*

Considering the evidence in the light most favorable to the defendant, the Court finds that the defendant had knowledge that the information contained in the statement was false. Testimony reveals that the defendant gave explicit directions to his bookkeeper, Donald J. Smit, to increase the value of his real estate holdings. Having done this, the Court is satisfied that defendant published the financial statements with the requisite intent to deceive.

Having found three of the four elements set forth in § 523(a)(2)(B) satisfied, the Court must now address the difficult issue of whether the plaintiff reasonably relied upon the financial statement when the loan was made. The creditor need not prove that it relied solely upon the false representation when it made the loan, it is sufficient if the creditor partially relied upon the false financial statements. *In re Sandlin (High Springs Bank v. Sandlin)*, 39 B.R. 936 (Bkrptcy.M.D.Fla.1984); *In re Drewett*, 13 B.R. 877 (Bkrptcy.E.D.Pa. 1981); *In re Tomei*, 24 B.R. 204 (D.W.D.N. Y.1982).

The Court finds that the plaintiff did not rely totally or partially upon the financial information supplied by the defendant. The evidence supports the conclusion that the plaintiff relied instead upon defendant's medical earnings potential, his past relationship with the bank, his payment history, and most importantly, that he was a member of the Board of Directors. William Gosset, President of plaintiff, testi-fied that the bank made little or no inquiry into the accuracy of the financial statements prior to making the loan. Instead, the bank merely ran a credit check to see if bad debts were in existence. This is not the reliance required under § 523(a)(2)(B)(iii).

Even if the Court did find some reliance upon the financial statements, such reliance would be unreasonable. Both financial statements are substantially incomplete. There are numerous blanks and unanswered questions. Additionally, it is also apparent that the values of defendant's real estate holdings are vastly inflated. The bank could have, and should have, required verification of these figures before they extended credit to the defendant. It did not.

The Court is also influenced in its decision by the fact that the bank failed to follow its own guidelines when it extended the credit to defendant. Specifically, the documents in question already disclosed an unsecured loan to the defendant in excess of the $150,000 line of credit. At the very least, this entry should have served as a "red flag" that the defendant was encountering financial problems.

Furthermore, by the time the bank renewed the loans for the last time, the financial statements on file were over a year old. Where a bank relies on "stale" financial statements and never inquires into whether the statements actually reflect the debtor's current financial situation, the bank fails to show reasonable reliance. *Matter of Holwerda*, 29 B.R. 486 (Bkrptcy.M.D.Fla.1983); *Matter of Nacol*, 30 B.R. 193 (Bkrptcy.M.D.Fla.1983).

It is one thing for the bank to pick apart the financial statements after the fact, it is another to show that it actually relied upon the financial statements when it extended and renewed the two loans. After reviewing all of the evidence, the Court cannot conclude that plaintiff relied in any way upon the financial statements submitted by defendant when it extended credit to him. The Court will enter judgment in favor of defendant and against the plaintiff on Count I of the Complaint.

Count II of plaintiff's complaint is founded upon § 523(a)(4). That section provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

■ A fiduciary relationship is one arising under both law and equity wherein one party places a special confidence in another and the latter is bound in equity and in good conscience to act in good faith and in the best interest of the former. *In re Kelley,* 84 B.R. 225 (Bkrptcy.M.D.Fla.1988).

Florida law recognizes that a director of a corporation owes a fiduciary duty to the corporation and to the stockholders and must act in good faith and in the best interest of the corporation. *Tillis v. United Parts, Inc.,* 395 So.2d 618 (Fla. 5th DCA 1981); *Snead v. United States Trucking Corp.,* 380 So.2d 1075 (Fla. 1st DCA 1980).

■ However, federal courts recognize that the question of whether a debtor is a fiduciary under § 523(a)(4) is a question of federal and not state law. *In re Black,* 787 F.2d 503, 506 (10th Cir.1986); *In re Johnson,* 691 F.2d 249, 251 (6th Cir.1982); *Matter of Angelle,* 610 F.2d 1335 (5th Cir.1980). Following this reasoning, these courts have found the traditional meaning of the term "fiduciary"—a relationship involving confidence, trust and good faith—to be far too broad for bankruptcy purposes. *See, Chapman v. Forsyth,* 2 U.S. (How.) 202, 11 L.Ed. 236 (1844); *Upshur v. Briscoe,* 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891); *Matter of Angelle,* 610 F.2d 1335 (6th Cir. 1980); *In re Kelley, supra.*

■ Thus, the scope of "fiduciary relationship" has been narrowed so that it now includes only express or technical trusts. Says the United States Supreme Court:

In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of trust. But this is not the relationship spoken of in the [Bankruptcy Act].... The Act speaks of technical trusts, and not those which the law implies from contract.

*Chapman v. Forsyth, supra,* 2 U.S. (How) at 207, 11 L.Ed. at 238.

With this teaching in mind, the Court finds that the defendant's actions are insufficient to rise to the level of breach of fiduciary duty. While a corporate director ought to scrutinize his self-dealings with the corporation he helps control, the dealings in this case can only be classified as an ordinary commercial transaction. There is no express or technical trust created by the transaction nor is there any evidence of wrongdoing.

The Court finds that the defendant is not guilty of fraud or defalcation while acting in a fiduciary capacity.

The Court will enter a separate final judgment in accordance with these findings.

### FINAL JUDGMENT

Upon Findings of Fact and Conclusions of Law separately entered, it is ORDERED as follows:

1. Final Judgment is entered in favor of the defendant, Kenneth M. Wing, and against the plaintiff, Liberty National Bank.

2. The debt owed by Defendant to Plaintiff is discharged and plaintiff is permanently enjoined from enforcing this indebtedness.

ORDERED.