In re Jeffrey E. GROSSMAN, Debtor.

WESTBANK, Westbank (Naperville), Westbank (Will County), and Westbank Financial Corp., Plaintiffs,

v.

Jeffrey E. GROSSMAN, Defendant.

Bankruptcy No. 92 B 1534.
Adv. No. 92 A 01242.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Nov. 17, 1994.

Carolyn Suzzi, Schillerstrom & Cresto, Naperville, IL, for plaintiffs.

David N. Missner, M. Gretchen Silver, Rudnick & Wolfe, Chicago, IL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

Plaintiffs sought in this adversary proceeding to bar dischargeability under 11 U.S.C. § 523(a)(2)(B) of certain debts assertedly due to them. They assert that Defendant misrepresented his cash flow and income on financial statements allegedly relied on in connection with loans, contending that it was half of that represented. All counts except Count I were earlier dismissed. Trial was held on Count I. Following trial and based on all evidence admitted, stipulations of the parties, and arguments of counsel, judgment was entered in favor of Defendant. The following Findings of Fact and Conclusions of Law made and entered herein comprise the basis for that judgment.

### FINDINGS OF FACT

1. Jeffrey E. Grossman, the Debtor and Defendant ("Debtor" or "Grossman"), is a citizen and resident of the State of Illinois.

2. When this adversary proceeding was first filed on September 14, 1992, Plaintiffs were three Illinois banking corporations and one holding company. Westbank is located in Westchester, Westbank/Naperville ("W/

N") was located in Naperville, and West-bank/Will County ("W/WC") was located in Joliet, Illinois.

3. Westbank Financial Corporation ("WFC"), a Delaware corporation, is a holding company which, until some time in early 1993, owned all of the common stock of W/WC and 98.3% of W/N. Westbank is an affiliate of WFC.

4. WFC was formed by Mr. Glen Marino ("Marino") and Mr. James Modrall ("Modrall"), who were President and Chairman of the Board of Directors, respectively, during the relevant time periods. Modrall also served as director of W/N, W/WC, and Westbank. Marino also served as a director of W/N and as president at Westbank for a period of time. Both were members of the Executive Loan Committee.

5. Grossman was a member of the WFC Board of Directors from January 1987 to August 1989. He also served on the Executive Loan Committee. At one time Grossman family-related entities were the third largest shareholders of WFC stock.

6. Marino testified that Grossman was a competent and well-respected member of the WFC Board of Directors. Marino's testimony was supported by a letter he wrote to Grossman on September 1, 1989, upon Grossman's resignation, commending him for his services while on the Board. See Ex. 69.

7. The majority of loans extended by W/N, W/WC, and Westbank (collectively the "Banks") were secured by real estate with personal guarantees. The Banks did not make non-recourse loans or unsecured loans over $20,000.00.

8. Procedures of the Banks with respect to loan applications for approval of proposed real estate secured loans depended on the amounts requested. Loans larger than $50,-000.00 and up to any of the Banks' lending limits were presented to either the Executive Loan Committee or the Board of Directors by the bank loan officer or president. The Executive Loan Committee (the "Committee") consisted of the presidents of each bank, outside directors of each bank, and Messrs. Marino, Modrall, and Grossman. The Committee met on the first Wednesday of each month, and the Board met on the third Wednesday of each month. Actions taken by the Committee were ratified by the WFC Board of Directors at its next meeting.

9. If a loan were approved by the Committee subject to certain terms or conditions, it was the loan officer and Marino's responsibility to see that the terms and conditions were met prior to funding the loan. If either of them was not satisfied that the terms and conditions had been met, either of them could schedule a special meeting or conference call for the Committee to revisit the issue of whether the loan should be made.

10. A loan package typically contained: (1) the Loan Presentation (a three-page form completed by the loan officer or president of the bank presenting the loan to the Committee); (2) financial statement(s) of the borrower(s) (and guarantor(s) if the borrowers were not individuals); (3) tax returns for the prior two years for the borrowers (and sometimes guarantors); and a "TRW" credit report for individual borrowers or guarantors. The Banks always obtained their own appraisal for real estate to be pledged as collateral, although the Committee customarily approved real estate loans subject to bank appraisals being performed. The Banks ordinarily lent on vacant or improved real estate, from 50% to 75% of the Banks' appraised value.

11. As Marino and Hausmann testified, if a loan was to be made to a director of the bank or a member of the WFC Board of Directors or an entity related thereto, the director's personal financial statement was not attached to the Loan Presentation or circulated to the Committee members or Board of Directors. As they also testified, neither the borrower-director's financial statement, tax returns, nor the TRW report of that director was attached to the Loan Presentation. Rather, certain information from that director's financial statement was summarized by the loan officer and circulated to the other directors or Committee members as part of the Loan Presentation. If any director or Committee member wanted to see the financial statement of a particular director who was seeking a loan, they could request it from Marino or the particular

bank president. The directors' personal financial statements were otherwise kept under lock and key. Tax returns and TRW's were kept in the credit file with the loan officer.

12. As a matter of federal law, all WFC directors were required to have on file with WFC a current personal financial statement. These financial statements were not required to be on a particular form or in a particular format. The financial statements were updated by directors at the end of each calendar year.

13. When Grossman joined WFC as a director in January 1987, he submitted a financial statement dated March 30, 1987, and signed July 17, 1987, to WFC in compliance with federal regulations. *See* Ex. 10. That financial statement had earlier been prepared in connection with a loan request to Banker's Trust and not in connection with any request for a loan from WFC or any of the Banks. Grossman testified that he submitted his 1987 financial statement in the summer of 1987. Marino testified that Grossman submitted his 1987 financial statement in the spring of 1988—not the summer of 1987. Whenever this statement was submitted, Marino carefully reviewed it with Grossman at that time and scribed the notes now found on Exhibit 10. Grossman had no further conversations regarding this financial statement or any information contained therein with Marino, Hausmann, Modrall, or any other Committee member or director at any later time.

14. Grossman did not submit the 1987 financial statement with intent to deceive WFC or the Banks because the projections of his income contained therein were generally accurate, and that statement was then submitted in compliance with federal regulations and not in connection with any pending or forthcoming loan request or guarantee.

15. In April 1988, Grossman approached Marino and Modrall at WFC to request a $1.4 million loan on behalf of Pioneer Business Group ("Pioneer"). The purpose of the loan was to provide working capital for Pioneer and to pay off certain other Grossman-related corporate liabilities. The loan was to be secured by, *inter alia*, vacant improved property at Jefferson Street and Grand in Chicago, Illinois (the "Sea Tac Property"). Grossman and North American Group Ltd. ("NAGL") were to serve as guarantors for the proposed loan.

16. In connection with the Pioneer loan request, Grossman presented Marino and Modrall with historical financial information about Pioneer and NAGL. *See* Ex. 5. He also submitted a recent $2.8 million appraisal of the Sea Tac Property. *See* Ex. 7. Grossman testified he further told Marino he intended to develop the Sea Tac Property and that he would meet a $900,000.00 paydown due in August 1989 through a construction loan to be obtained from another financial institution. Modrall was aware Grossman intended to develop the property.

17. Marino testified that, in connection with the Grossman loan request, he reviewed the $2.8 million appraisal (Ex. 7), Grossman's 1986 personal tax return, and financial information for both Pioneer and NAGL. The NAGL financial information included an audited financial statement from Laventhol & Horwath, NAGL's accountants, a copy of NAGL's form 10K filed December 31, 1986, and a copy of its form 10Q for the third quarter of 1987. *See* Ex. 11.

18. Marino and Modrall presented all of the information proffered by Grossman to Marc Hausmann, president of W/N, and instructed him to prepare a Loan Presentation. Fred Karl, a W/N vice-president, created a spreadsheet of the NAGL financial information, which was admitted into evidence as part of Ex. 11.

19. The Pioneer Loan Presentation was first given to the Committee on or about April 6, 1988. The Pioneer loan was approved on April 6, 1988, as reflected by the April 29, 1988, Minutes of the WFC Board of Directors meeting at which the Committee action was ratified. *See* Ex. 85.

20. Between April 6, 1988, and May 4, 1988, the parties to the loan changed and the borrower became Sea Tac Properties, Ltd., an Illinois limited partnership. Grossman and NAGL became joint guarantors. Grossman submitted a new package of information to the Committee (Ex. 4) in connection with

the revised loan ("Sea Tac Loan" or "Loan 1").

21. Hausmann drafted and submitted a Memorandum and Loan Presentation to Committee members at the May 4, 1988, meeting. *See* Ex. 3.

22. The Memorandum (Ex. 3, p. 1) stated that the purpose of the loan was to provide working capital requirements for Pioneer Business Group. The Memorandum also stated that the loan had been previously approved, but that the borrower was changing from Pioneer Business Group to Sea Tac Properties, Ltd. The Memorandum stated that "[t]his loan will be repaid from the projected cash flow from Pioneer Business Group ... Secondary source of repayment is from the other guarantors and Jeffrey Grossman."

23. Hausmann recommended in the Memorandum that the Sea Tac Loan be approved because: it had previously been approved to Pioneer Business Group on similar terms; two additional pieces of collateral were to be added to the collateral package; the Banks were familiar with and confident in the management (Grossman); and Pioneer's projected cash flow appeared adequate to service the requested loan.

24. In the Loan Presentation, Hausmann summarized the terms of the loan and stated that the loan was subject to the following:

a. loan agreement

b. appraisal of property "as is"

c. buildability of property

d. approval of trust documents

e. attorney prepare documents

f. financial statements.

25. The Loan Presentation also included a section entitled "Guarantor Summary" that requested specific information about the guarantor: name, statement date, total assets, liabilities, net worth, contingent liabilities, and income. Hausmann wrote in the words, "Jeffrey Grossman in excess of $10MM" from information concerning his assets obtained from Grossman's March 30, 1987, financial statement (Ex. 10) which had previously been filed with WFC. There was no reference in the written Loan Presentation to Grossman's income or cash flow.

26. The March 1987 financial statement was 10 pages long and included a detailed analysis of Grossman's assets and liabilities. It showed a net worth of about $10 million; it showed cash on hand of approximately $1.5 million; it listed two contingent liabilities totalling $462,000.00, and it listed no pending lawsuits in which Grossman was the Defendant. This statement did not purport to state his 1986 income or 1987 income to date. Page 10 of the statement was entitled "Statement of Projected Annual Cash Flow (Next 12 Months)." This was projected to be $1,404,000.00 with expenses of $413,000.00, which left "net cash flow to service additional debt and expenses" of $991,000.00.

27. Marino testified that, while the entire copy of Exhibit 10 was not circulated at the May 4, 1988, Committee meeting, the Statement of Projected Cash Flow (Next 12 Months) (Ex. 10, p. 10) was either circulated at that meeting or attached to the Loan Presentation (Ex. 3). However, Modrall and Hausmann testified that they could not recall what, if anything, was circulated or attached to the Loan Presentation at that meeting, and the original Loan Presentation document or package as presented to the Committee was not introduced into evidence. Grossman testified that page 10 of Exhibit 10 was not circulated to the other Committee members at the meeting. Plaintiffs presented no other evidence that any member of the Executive Loan Committee ever requested or saw Grossman's 1987 financial statement (Ex. 10) or any part thereof. While Marino was a credible witness, his memory in this regard was uncorroborated by contemporaneous documents, and that memory is influenced by his obvious contempt for what he perceives as Grossman's failure to volunteer more details about his income. Plaintiffs have not proved by a preponderance of the evidence that there was discussion about Grossman's cash flow or income at the May 4, 1988, Committee meeting at which Loan 1 was approved.

28. Grossman testified that the 1987 financial statement was true, correct, and accurate as of March 30, 1987; as of July 17,

1987; and as of June 1988, fifteen months after it was signed and tendered to WFC. He further testified that his actual 1987 cash flow was in excess of the $1,404,000.00 projected as of March 30, 1987. His 1988 federal income tax return in evidence showed cash flow during that year in excess of $1.1 million (even though taxable income was shown as half of that cash flow). Plaintiffs have not offered persuasive evidence to the contrary. Nor did they establish that the Banks ever asked Grossman to verify that the information contained in Exhibit 10 was accurate as of May 4, 1988, even though a condition of the approval of Loan 1 was that Grossman provide a current financial statement because the Committee considered the 1987 statement to be stale.

29. This Court extensively questioned Grossman about his projected income for the period March 31, 1987, through April 1, 1988 (from the page of Exhibit 10 entitled "Projected Annual Cash Flow (Next 12 Months)"). Grossman thoroughly explained his factual basis for estimating the figures under that category. Included in Grossman's answer was a detailed explanation of a $300,000.00 fee from Sidney Weninger, which Grossman explained was earned for certain consulting work he performed for Weninger. *See* Ex. 90. Grossman further testified that, although his actual cash flow for calendar year 1987 exceeded projections, he could not recall whether cash received was categorized as projected, i.e. as repayment on a loan receivable or as payment of fees. He testified that, if he had an outstanding loan receivable to an entity that also owed him fees, he generally elected to receive payment as a loan receivables payment instead of fees, for tax purposes. Grossman offered substantial documentary corroboration of much of his testimony.

30. The Committee minutes from May 4, 1988 (Ex. 15) reflect that Loan 1 was unanimously approved by ten of the eleven attending members. Grossman attended the meeting but abstained from voting. The May 4, 1988, minutes (Ex. 15) state that Loan 1 was subject to the following:

   a. loan agreement

   b. appraisal of property "as is"

   c. buildability of property

   d. approval of trust documents

   e. preparation of documents by attorney

   f. financial statements

31. The May 3, 1988, minutes do not reflect any discussion of Grossman's personal financial statement, NAGL's financial information, or the Committee's reliance thereon. There is no contemporaneous documentary record showing that Grossman's March 1987 financial statement or any part thereof was ever seen or discussed by the Committee members at the meeting when Loan 1 was approved. The Committee did discuss obtaining a current "as is" appraisal of the Sea Tac Property and discussed the reformulation of the loan from its previous discussion at the April 1988 meeting at which Loan 1 was initially approved. The Committee also discussed obtaining the appropriate documentation for Loan 1 as a term or condition of closing the loan.

32. As Hausmann, Modrall, and Marino each testified, the Banks needed an updated financial statement from Grossman (1) for bank regulator purposes because his 1987 financial statement was "stale" and (2) as one of the six conditions to close the loan.

33. A second Grossman-related loan request was also heard on May 4, 1988 (the "Grossman Home Equity Loan"). The Committee voted to loan Grossman $1.5 million personally, secured by a second mortgage on his home. The Loan Presentation (Ex. 2) indicated that the funds were to be used in part ($1,150,000.00) to purchase Letters of Credit. Plaintiffs did not request an updated financial statement from Grossman in connection with this loan. The loan was unconditionally approved by the Committee. *See* Ex. 15.

34. As evidenced by Exhibit 89, parts 2 through 8, over $1.8 million in Letters of Credit were issued by W/N prior to October 26, 1988, on behalf of Grossman for which Grossman had pledged cash. The fact that Grossman had pledged cash for Letters of Credit was indicated on his June 21, 1988, financial statement. *See* Ex. 9.

35. Hausmann (as the loan officer) and Marino (as President of WFC) were responsible for assuring that the six terms and conditions subject to which the Committee approved Loan 1 were satisfied prior to closing.

36. Hausmann testified he did the following to assure that the conditions were met: he obtained from the Banks' appraiser a $2.0 million "as is" appraisal of the Sea Tac Property dated May 20, 1988 (Ex. 8); he obtained the loan agreement, trust documents, and other necessary legal documents prepared by Mr. Alan Wolf, an attorney and member of the WFC and W/N Boards of Directors; and he obtained Grossman's updated financial statement as of June 6, 1988, dated June 21, 1988 (Ex. 9).

37. To satisfy one of the conditions of approval of Loan 1, Grossman submitted his updated financial statement (Ex. 9) to the Banks between June 21, 1988, and June 28, 1988. The June 21, 1988, financial statement was six pages long and contained a detailed listing of Grossman's assets and liabilities. It did not, however, contain a "Projected Annual Cash Flow," as did the 1987 statement (Ex. 10). The Banks did not object to the form of Grossman's June 21, 1988, financial statement. The statement listed Grossman's net worth as $5,578,435.00 and his anticipated gross annual income as $1,172,-000.00, which included "Receivables" of $350,000.00. Grossman disclosed therein that he had approximately $1,533,000.00 in cash. However, on page 1 of the statement, with respect to the cash, he stated "partial cash securing Letter of Credit line." Grossman further disclosed that he had contingent liabilities and that he had been named in lawsuits other than as a plaintiff.

38. No one on behalf of the Banks requested an update of Grossman's cash flow when the 1988 financial statement did not report cash flow.

39. Hausmann testified that, although he received Grossman's June 21, 1988, financial statement (Ex. 9), he did not review or analyze information contained therein. He also did not speak with Marino about the June 21, 1988, financial statement or its contents.

40. Hausmann further testified that, after he was satisfied that the conditions of Loan 1 had been fulfilled, he closed the loan.

41. Prior to the closing of Loan 1, Marino reviewed Grossman's 1988 financial statement. See Ex. 9. He examined Grossman's statement and noted that Grossman's stated net worth had dropped by approximately 50%. Marino asked Grossman to explain the drop in net worth, and Grossman replied that he was doing some estate planning that resulted in certain assets being transferred out of Grossman's name, thereby resulting in the drop in his net worth. Marino made no further inquiry of Grossman nor did he do any further investigation into that or other information on the June 21, 1988, financial statement. Specifically, Marino, Hausmann, and Modrall each admitted that neither they nor any other member of the Committee or director ever asked Grossman (prior to the funding of Loan 1 or ever thereafter) to do any of the following:

a. to provide a detailed cash flow statement for 1988 as he had for 1987;

b. to provide information about his anticipated 1988 income taxes;

c. to provide information about the amount of his 1988 expenses;

d. to detail his contingent liabilities;

e. to explain whether $1.5 million in cash shown on the statement was all pledged as suggested by the statement on page 1, Exhibit 9;

f. to assess whether his income or cash flow would be as high as $1,172,000.00, since so much income he had received was for "anticipated" salary and fees;

g. to identify how much of the "anticipated" salary and fees he had earned to date but had not yet been paid;

i. to identify how much of the "anticipated" loan receivables were due to date but had not yet been paid.

42. Marino testified that he may have discussed the June 21, 1988, financial statement or some of its contents with Hausmann or Modrall, but could not specifically recall. Modrall testified that he never saw the 1988 financial statement prior to the funding of Loan 1. Rather, he relied on Marino's "very

thorough analysis" and Marino's statement to him that Grossman's income was "about the same." Hausmann testified that he did not recall any conversation with Marino about the 1988 financial statement prior to Loan 1 funding.

43. Both Grossman and Marino testified (and it is so found), that between June 21, 1988, and June 29, 1988, they did not discuss anything regarding the June 1988 financial statement other than the reductions in Grossman's stated net worth. Loan 1 closed and was disbursed on June 29, 1988. Grossman never had any further conversation with Modrall, Hausmann, or Marino or any other member of the Committee or WFC director prior to the closing of either Loan 1 or the Sea Tac Letters of Credit ("Loan 2") regarding either of his financial statements.

44. No Committee member other than Marino or Hausmann ever saw the June 21, 1988, financial statement (Ex. 9) or received any information about it prior to closing Loan 1.

45. Marino testified that, in the event a loan was approved but a subsequent condition was not satisfied, a special meeting of the Executive Loan Committee or Board of Directors could be called to reconsider approval of the loan. He further testified that he saw Grossman's 1988 statement (Ex. 9), saw that his net worth had dropped by $5 million, but did not feel it was necessary to call a special meeting to reconsider approval of Loan 1. Hausmann, the presenting loan officer, also failed to call a special meeting to reconsider the loan approval.

46. A review of Grossman's 1988 financial statement (Ex. 9) reveals that there are no notes or handwriting on the statement. Marino testified that he made no notes on the statement nor did he prepare a separate written analysis of the contents or nature of Exhibit 9.

47. Grossman testified that his 1988 financial statement (Ex. 9) was true, correct, and accurate as of June 6, 1988, June 21, 1988, and October 1988. He testified that the anticipated income entry "Receivables" for $350,000.00 was for money owed to him and, if it were collected, would increase cash

flow, but would not be taxable income. He testified that, while his income for tax purposes in 1988 was approximately $500,000.00, his cash flow was well in excess of $1.5 million. Grossman testified that he had no intent to deceive WFC or the Banks when he submitted his 1988 financial statement.

48. This Court extensively questioned and cross-examined Grossman about his statement (Ex. 9) as to his 1988 anticipated income. Grossman explained each figure under the columns on page 1 of Exhibit 9 entitled "Anticipated Sources of Income for Year Ended December 31, 1988," and his factual basis for estimating the figures under that category. Grossman further testified that, although his actual cash flow for 1988 exceeded projections, he could not recall whether cash received was categorized as projected, i.e. as repayment on a loan receivable or as payment of fees. He testified that, if he had an outstanding loan receivable to an entity that also owed him fees, he generally elected to receive payment as a loan receivables payment instead of fees, for tax purposes. Grossman's explanation was credible, substantially corroborated by documents, and adequately detailed a reasonable basis for his income projection.

49. Loan 1, funded on June 29, 1988, was evidenced by the following documents:

a. Note in the amount of $1.4 million, dated June 29, 1988 (Ex. 21);

b. Mortgage on Sea Tac Property dated June 29, 1988 (Ex. 23);

c. Assignment of Leases and Rents (Ex. 24);

d. Collateral assignment of beneficial interest in land trust (Ex. 25);

e. Guaranty of Grossman and NAGL, signed by Grossman personally, and Jeff Naylor, NAGL's Executive Vice–President (Ex. 26);

f. Collateral Assignment of Beneficial Interest in Promissory Note (the "Collateral Assignment"), signed by Grossman as President of Jefferson Properties, Ltd., Sea Tac's general partner, and acknowledged by Naylor for NAGL and Wolf for W/N (Ex. 27);

g. Demand note from NAGL to Sea Tac Properties, Ltd. in the amount of $688,612.23, dated June 29, 1988 (Ex. 22).

50. Loan 1 was for $1.4 million with interest at only 1½% over prime payable monthly with a principal paydown due on August 31, 1989, of $900,000.00, and the balance of $500,000.00 due on December 31, 1989. If prime was 8%, then $133,000.00 in interest per year would be due or $11,083.33 per month would be due. According to Marino, interest had been paid in full on Loan 1, and it was not in default as of October 26, 1988.

51. On October 26, 1988, by virtue of a wire transfer from Merchandise National bank, the $1.4 million Loan 1 was paid in full, as evidenced by a copy of the note so marked and a copy of the Release and Satisfaction of Mortgage. *See* Ex. 62.

52. Marino testified that it was discovered in the late summer of 1988 that Alan Wolf, counsel and director of WFC, had not properly documented Loan 1, thereby creating an overline problem for W/N. Grossman testified that Wolf told him that, if Loan 1 was restructured to eliminate Grossman as a guarantor, it would assist in correcting the overline. To achieve compliance with banking regulations, Marino testified that the Banks needed to modify or remove Loan 1.

53. In October 1988, Grossman approached Marino and Modrall with a proposal to pay off the Sea Tac Loan and replace it with a contingent liability for the balance through a Letter of Credit transaction. Grossman wanted to take advantage of a discount being offered by Merchandise National Bank. By obtaining Letters of Credit from the Banks, Grossman allegedly stood to receive a discount and savings in interest of approximately $1 million. Thus, his interest coincided with the Banks' interest in restructuring Loan 1.

54. The new transaction was referred to as the Sea Tac Letters of Credit ("Loan 2"). Loan 1 had been a simple $1.4 million loan evidenced by a note, secured primarily by the Sea Tac Property, and guaranteed by Grossman personally and NAGL. Loan 2 was for a total of $1.95 million, divided into two portions: a $1.425 million Demand Note made by Sea Tac Properties, Ltd., Jefferson Properties, Ltd., and LaSalle National bank as Trustee to W/N, W/WC, and Westbank/Westchester (n/k/a Westbank); and a $525,000.00 Demand Note made by Wolf Point Equities, Ltd. to W/N, W/WC, and Westbank. The $1.425 million Note was guaranteed by Grossman and by NAGL; the $525,000.00 Note was guaranteed by an unrelated third party individual.

55. Loan 2 was secured by:

a. The Sea Tac Property pledged as collateral for Loan 1;

b. Collateral assignment from Sea Tac Properties, Ltd. to W/N, W/WC, and Westbank of a $1 million Promissory Note made by Pioneer Business Group to Merchandise National Bank;

c. Assignment of Grossman's life insurance policy for $1.75 million; and

d. WFC stock held by Grossman and Grossman family-related entities.

56. Loan 2 involved the issue of two letters of credit in the above amounts in favor of Merchandise National Bank on which W/N was a co-applicant with LaSalle National Bank (the Banks' correspondent bank). The transaction was very complex, as illustrated by Marino's notes, admitted into evidence as Exhibits 14 and 42. (Indeed, it diagramed out visually more complex than the diagrams used by opponents to ridicule the President's recently proposed national health care plan.) There was conflicting testimony as to whether these notes were circulated to the other directors prior to their voting on Loan 2. Hausmann testified that Marino structured Loan 2, and Hausmann merely helped write up the Loan Presentation. Ex. 6. Hausmann did not know why letters of credit were used to replace the interest bearing note of Loan 1, or why the interest dropped to 1% per year from 1½% over prime, or why the term of the loan was extended from one year to three years (from October 1988 to October 1991).

57. Hausmann prepared a Loan Presentation and separate Memorandum for Loan 2. *See* Ex. 6. There is conflicting testimony as to whether the Loan Presentation was circulated to the Board of Directors on or about

October 17, 1988, the day on which Loan 2 was approved by a telephone poll. *See* Ex. 20.

58. The Guarantor Summary section of the Loan Presentation prepared by Hausmann for Loan 2 listed the following information that Hausmann extracted from Grossman's 1988 financial statement:

NAME: Grossman; STMT.DATE: 6/88; TOT.ASSETS: $6,910,435; LIABILITIES: $1,332,000; NET WORTH: $5,578,435; CONT.LIAB.: Yes; and INCOME: $1,172,000.00.

It was not established by persuasive or preponderant evidence that Grossman's 1987 financial statement (Ex. 10) was considered by any director in connection with Loan 2.

59. The Banks did not request and Grossman did not provide any further financial information in connection with Loan 2 other than that which was already in the Banks' file, which was his 1988 financial statement. *See* Ex. 9. Furthermore, prior to October 17, 1988, the date Loan 2 was approved, neither Marino nor any other member of the Committee or Board of Directors questioned Grossman regarding his 1988 financial statement. Findings, ¶¶ 57, 58, 62.

60. On or about October 17, 1988, Hausmann conducted a telephonic poll of the directors for approval of Loan 2. Marino testified that Hausmann's Loan Presentation, Memorandum, and any other documentation which may have been presented "was probably" telefaxed or delivered to the directors prior to the that poll. After the poll, Hausmann prepared a separate memorandum memorializing approval of the loan. Ex. 20. Hausmann's Loan 2 Memorandum states that the loan was approved subject to the "routine underwriting requirements for this type of loan." The Loan Presentation indicated that it was subject to "Alan Wolf's preparation of documents, verification of the first mortgage balance, Trust Agreement and Cert. of Ownership. . . ." The telephonic poll of the Board of Directors was ratified at the December 21, 1988, meeting of the Board as reflected in the Minutes of that meeting. *See* Ex. 17.

61. Loan 2, funded on October 26, 1988, was evidenced by the following documents:

a. $1,425,000.00 Demand Note from LaSalle National Bank as Trustee under Trust No. 111997, Sea Tac Properties, Ltd., Jefferson Properties, Ltd. to W/N, W/WC, Westbank dated October 26, 1988 (Ex. 28);

b. $525,000.00 Demand Note from Wolf Point Equities, ltd. to W/N, W/WC, Westbank dated October 26, 1988 (Ex. 29);

c. Mortgage dated October 26, 1988, by LaSalle National Bank under Trust No. 111997 to W/N, W/WC, Westbank to secure $1,425,000.00 Demand Note (Ex. 31);

d. Assignment of Leases and Rents dated October 26, 1988, by LaSalle as Trustee under Trust No. 111997, to W/N, W/WC, Westbank, to secure $1,425,000.00 Demand Note (Ex. 31);

e. Collateral ABI from Jeff Grossman of beneficial interest in Trust No. 100819 [Wolf Point Property] to W/N, W/WC, Westbank dated October 26, 1988 (Ex. 32);

f. Collateral ABI from Jefferson Properties, Ltd. of beneficial interest in Land Trust No. 11197, dated October 26, 1988 (Ex. 33);

g. Guaranty of Donald Grauer of $525,-000.00 Note dated October 26, 1988 (Ex. 34);

h. Guaranty of Jeffrey E. Grossman of $1,425,000.00 Note dated October 26, 1988 (Ex. 35); and

i. Collateral Assignment of $1 million Promissory Note (made by Pioneer Business Group to Merchandise National Bank) from Sea Tac Properties, Ltd. to W/N, W/WC, Westbank (Exs. 36, 87).

62. Marino admitted there was a mistake in the October 17, 1988, Loan Presentation (Ex. 6) because it stated Grossman had cash of $1.5 million when in fact this had been pledged to secure letters of credit issued by the Banks. Furthermore, Modrall, Hausmann, and Marino admitted that, prior to Loan 2 funding, neither they nor any other member of the Committee, so far as they were aware, had requested Grossman:

a. to provide a new financial statement;

b. to provide a detailed cash flow statement for 1988 as he had for 1987;

c. to provide information about his anticipated 1988 income taxes;

d. to provide information about the amount of his 1988 expenses;

e. to detail his contingent liabilities;

f. to explain whether $1,500,000.00 in cash shown on statement was all pledged per the statement on page 1, Exhibit 9;

g. to assess whether his income and cash flow would be as high as $1,172,000.00 since so much of his income was for "anticipated" salary and fees;

h. to identify how much income he had received as of the date of the statement;

i. to identify how much of the "anticipated" salary, fees, and loan receivables he had earned to date, but had not yet been paid; and

j. to identify how much of the "anticipated" loan receivables were due to date, but had not yet been paid.

63. Other than Marino's discussion with Grossman regarding his net worth, no member of the Committee or WFC Board of Directors ever asked Grossman a single question regarding his 1988 financial statement (Ex. 9) (Findings, ¶¶ 39, 41).

64. Grossman was forced to resign from the WFC Board of Directors in 1989, although Marino gave him a complimentary farewell letter at the time.

65. On or about November 5, 1991, Loan 2 went into default, and LaSalle's Letter of Credit was called. LaSalle then collected the $1,425,000.00 from W/N as its co-applicant. Westbank, W/N, and W/WC then foreclosed on the Sea Tac Property. Grossman testified that, between the funding of Loan 2 and the default, the real estate market turned sour and, as a result, he was unable to sell or refinance the Sea Tac Property.

66. On July 17, 1992, the Circuit Court of Cook County entered a deficiency judgment (the "Deficiency Judgment") (Ex. 37) in favor of each bank as follows:

a. Westbank/Naperville       $381,016.00
b. Westbank/Will County      $359,243.65
c. Westbank/Westchester      $348,357.48

Those judgments were entered against, *inter alia,* Grossman.

67. On or about February 4, 1993, WFC sold all of its right, title, and interest in and to W/WC and W/N to NJIC, Inc., an unrelated third party bank holding company. According to Modrall's testimony, WFC had to sell W/N and W/WC because WFC was in default on a loan from First Wisconsin, n/k/a Firstar, for which the stock had been pledged as collateral, and Firstar was seeking to be repaid. Modrall also testified that WFC was being pressured by federal regulators to sell W/N and W/WC due to capital inadequacy and loan problems. NJIC, Inc. changed the names of the banks from W/N to The Naperville Bank and from W/WC to The Bank of Joliet sometime in mid–1993.

68. WFC now holds by assignments executed during the trial the rights, titles, and interests of W/N and W/WC under the Deficiency Judgment. WFC thereby holds, pursuant to those assignments, W/N and W/WC's standing to pursue Grossman under § 523(a)(2)(B) of the Bankruptcy Code to seek dischargeability of the judgment debt, and plaintiffs W/N and W/WC lost their standing to do so during the trial.

69. Plaintiffs allege in Paragraph 9 of the Complaint that Grossman directed the Plaintiffs to rely on his 1987 Statement of Projected Annual Cash Flow (Next 12 Months) in connection with the extension of credit on Loan 2. However, Grossman denied this allegation, and Plaintiffs presented insufficient evidence to support that assertion. Modrall, Marino, and Hausmann testified that they did not request any further information from Grossman regarding his financial condition after he submitted his 1988 financial statement except for an explanation of his reduced net worth. Indeed, it was not established that, after Loan 1 closed, the 1987 statement (Ex. 10) was ever looked at or relied upon by the Banks.

70. Despite Plaintiffs' continued assertion until trial of alleged overvaluation of certain assets listed in the Debtor's June 1988 financial statement (¶ 8a–f of the First Amended Complaint), Plaintiffs presented no evidence in support of those allegations. At trial, Plaintiffs on the record withdrew all allega-

tions contained in ¶ 8b–f of the First Amended Complaint and presented no persuasive evidence supporting ¶ 8a thereof. Therefore, Plaintiffs abandoned and failed to prove any claims pleaded in ¶ 8a–f of the First Amended Complaint. The Banks remaining allegations essentially challenge the validity of Grossman's projections of cash flow and income. A remaining allegation challenging the value of one small asset was not shown to be material to the Banks' analysis.

71. Neither the Debtor's Statement of Projected Annual Cash Flow (Next 12 Months) (Ex. 10, p. 10) or his 1988 Financial Statement (Ex. 9) contained any materially false statements. Grossman had reasonable factual basis for each entry on the Debtor's Statement of Projected Annual Cash Flow (Next 12 Months) (Ex. 10, p. 10) and for the "Salary and Fees" entries on the 1988 Financial Statement (Ex. 9), the entries upon which the Banks allegedly relied when they extended Loan 1 and Loan 2.

72. Fact statements set forth in the Conclusions of Law will stand as additional Findings of Fact. Legal conclusions contained in the Findings of Fact will stand as additional Conclusions of Law.

## CONCLUSIONS OF LAW

1. This Court has both personal and subject matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a). This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue in this District is proper under 28 U.S.C. § 1409.

■ 2. Defendant objected to the standing of WFC to assert rights against Grossman by reason of the assignments to it by W/N and W/WC of their rights as judgment creditors. The objections rest on asserted authority under Illinois law suggesting that

one may not assign a fraud claim. This rested on the assumption that a fraud claim must have been assigned because the present action under 11 U.S.C. § 523(a)(2)(B) rests on a fraud theory. However, clearly no fraud claim was assigned; only judgment debts based on Grossman's guarantee were assigned. No authority was cited to show that, under non-bankruptcy law (here Illinois law applies), the assignment of rights to a judgment not based on fraud is in any way barred. The requirement under bankruptcy law that some elements of fraud be exhibited has no effect under the cited authority to emasculate the assignment itself. Therefore, WFC obtained standing during trial to pursue this cause of action against Grossman, and W/N and W/WC lost that standing during trial because of the assignments.

■ 3. Plaintiffs request that this Court deem certain debts owed by Grossman non-dischargeable under § 523(a)(2)(B) of the Bankruptcy Code.[1]

■ 4. The party seeking to establish an exception to discharge of a debt bears the burden of proof. *In re Martin,* 698 F.2d 883, 887 (7th Cir.1983).

■ 5. Creditors must prove each element under § 523(a)(2) by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ 6. The discharge provisions of § 523 of the Bankruptcy Code are construed strictly against the creditor and liberally in favor of the debtor. *In re Zarzynski,* 771 F.2d 304, 306 (7th Cir.1985).

■ 7. To have a debt deemed non-dischargeable under § 523(a)(2)(B), a creditor must prove that the debtor used a statement

---

**1.** Section 523(a)(2)(B) of the Bankruptcy Code provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debts-

. . . . .

(2) for money, property services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

. . . . .

(B) use of a statement in writing—

(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with the intent to deceive....

11 U.S.C. § 523(a)(2)(B).

in writing that was materially false respecting his or an insider's financial condition, on which the creditor reasonably relied, and the debtor caused to be made or published with the intent to deceive. 11 U.S.C. § 523(a)(2)(B); *See In re Harasymiw,* 895 F.2d 1170, 1172 (7th Cir.1990).

8. With respect to the issue of whether a financial statement is materially false, the Seventh Circuit has not determined whether the "but for" test must be applied. *Harasymiw,* 895 F.2d at 1173. The "but for" test would require a creditor to prove that but for the material misrepresentation, no credit would have been extended. The opinion in that case did note cases defining materiality under § 523(a)(2)(B) as "an important or substantial untruth" and called the *causa sine qua non* test (the "but for" test) a "recurring guidepost." *Harasymiw* at 1172 (citing *In re Bogstad,* 779 F.2d 370, 372 (7th Cir.1985)). This tends to show some support for the "but for" test in this Circuit, and for purposes of this decision, that standard will be presumed to be the applicable standard. With respect to false statements or representations, in order to be false for purposes of § 523(a)(2)(A), a false representation must concern present or past asserted facts and not be representations or promises to do future actions unless the debtor never intended to perform or had no reasonable basis for his promise of performance or other representation. *In re Pawlinski,* 170 B.R. 380, 393 (Bankr.N.D.Ill.1994) (and authorities cited) (Schmetterer, J.). The latter standard applies to Grossman for projections of cash flow and income which the Banks claim were false. The key issues here are therefore (1) whether the Banks proved they would not have issued the loans if they had known Grossman's taxable income was less than the cash flow he projected, and (2) whether or not Grossman had reasonable bases for his projections of cash flow and income.

9. Actual reliance on a representation may be shown by evidence that the creditor would not have extended the credit if it had known the truth. *In re Mitchell,* 70 B.R. 524, 527 (Bankr.N.D.Ill.1987) (Schmetterer, J.).

10. The standard for measuring the reasonableness of a creditor's reliance is an objective test that requires the Court to measure the creditor's actual conduct against:

a. The creditor's standard practices in evaluating credit worthiness;

b. The standards or customs of the creditor's industry in evaluating credit worthiness;

c. The surrounding circumstances existing at the time of the debtor's application for credit.

*Mitchell,* 70 B.R. at 527–28; *In re Iaquinta,* 98 B.R. 919, 923 (Bankr.N.D.Ill.1989) (Squires, J.)

11. Whether Debtor had the requisite intent to deceive can be established by proving either actual knowledge of the falsity of the statement or a reckless indifference to or reckless disregard for the accuracy of the information in the financial statement. *In re Bailey,* 145 B.R. 919, 931 (Bankr.N.D.Ill.1992) (Ginsberg, J.) (citing *Matter of Garman,* 643 F.2d 1252 (7th Cir. 1980)). An intent to deceive may logically be inferred from a false representation which the debtor knows or should know will induce another to advance money to the debtor, *Pawlinski,* 170 B.R. at 393, or may be inferred from the surrounding circumstances. However, it is the creditor's burden to provide evidence from which such an inference can be drawn. *Matter of Stratton,* 140 B.R. 720, 723 (Bankr.N.D.Ill.1992). Intent is a separate and distinct statutory requirement that must be proved by the creditor to except the debtor's debt from discharge. *Id.*

12. The reliance issue presented here is very similar to that in *In re Wing,* 96 B.R. 369 (Bankr.M.D.Fla.1989), in which a bank sought to except from discharge a debt obtained through the use of a materially false financial statement. The debtor was a physician and sophisticated businessman who was also on the board of directors of the bank that filed the adversary. During his tenure as a director, he borrowed money on an unsecured basis from the bank, as it was a bank policy to provide an unsecured line of credit to directors in the amount of $150,-000.00 if the director maintained a current financial statement on file. That require-

ment was formulated primarily to satisfy the regulatory concerns rather than to serve as data to support a loan. *Id.* at 371.

After the debtor defaulted on his line of credit (that exceeded $150,000.00) and filed for bankruptcy, the bank discovered several inaccuracies on his financial statement: there was a mathematical error, mortgage payments and rental income were omitted as were other obligations, and certain real estate holdings were listed as having a substantially higher value than they did. After a trial on the merits, the court held that the debtor submitted a materially false financial statement and that, based upon the surrounding circumstances, the intent to deceive could be inferred in this case. *Id.* at 372.

However, with respect to the issue of reliance, the court held that the bank:

> did not rely totally or partially upon the financial information supplied by the defendant, but upon his earnings potential as a physician, his past relationship with the bank, his payment history, and most importantly, that he was a member of the Board of Directors ... President of the Plaintiff, testified that the bank made little or no inquiry into the accuracy of the financial statements prior to making the loan. Instead, the bank merely ran a credit check to see if bad debts were in existence. This is not the reliance required under Section 523(a)(2)(B)(ii).

*Id.* at 373.

13. Plaintiffs have proven only two of the five requisite elements: Grossman submitted a written financial statement dated June 21, 1988, reflecting his personal financial condition. However, Plaintiffs failed to prove the remaining elements required by § 523(a)(2)(B) by a preponderance of the evidence: that the financial statement was materially false; that the Banks actually and reasonably relied on the financial statement; and that Grossman submitted the financial statement to the Plaintiffs with the intent to deceive.

14. As shown in the Findings made hereinabove, Plaintiffs have failed to prove by a preponderance of the evidence that either of Grossman's financial statements was materially false.

15. As to the issues related to reliance, Marino testified that he reviewed the 1988 financial statement, but he did not verify, investigate, or inquire about the information on which he assertedly relied (Debtor's projected cash flow, income, and cash) nor did he communicate to any of the other Committee members any of his alleged concerns regarding the June 21, 1988, financial statement. The loan officer, Marc Hausmann, testified that he did not analyze or review Grossman's 1988 financial statement. Furthermore, no other director ever saw the 1988 financial statement prior to the closing of Loan 2. Indeed, given Mr. Grossman's powerful role on the Board and given that he was a good customer of the Banks, the review of his finances was cursory. The Banks relied primarily on the loan collateral for each loan. Plaintiffs have therefore failed to prove that they actually relied on either the 1987 or 1988 financial statement when the Board of Directors voted via telephone to approve Loan 2.

16. Even if Plaintiffs had proven that they actually relied on the June 21, 1988, financial statement for Loan 2, they did not establish that such reliance was reasonable. Neither the June 21, 1988, financial statement nor any part thereof was circulated to Committee members with Hausmann's Memorandum and Loan Presentation. With respect to Loan 2, if the Loan Presentation was circulated, Plaintiffs were content to rely on a one-line summary prepared by Hausmann of the Grossman's net worth as copied from his June 21, 1988, financial statement, not on his projected income. (Plaintiffs did not establish that Grossman's net worth at the time was falsely stated.) Furthermore, any continued reliance on Exhibit 10 after June 21, 1988, was unreasonable and unwarranted because it was not given in connection with a loan. When Loan 1 was being reviewed, the 1987 financial statement was considered "stale" by the Committee and an updated financial statement was a condition to the approval of that loan. The 1988 financial statement was requested, and it clearly superseded the 1987 financial statement as the

1987 statement was prepared over fifteen months earlier. No one from the Committee or the Banks ever asked Grossman whether the information contained in Exhibit 10 with respect to the projected cash flow had in fact occurred. Therefore, any reliance by the Plaintiffs on the 1987 financial statement after receipt of the 1988 statement would have been unreasonable, particularly in light of their failure to inquire whether the earlier projections had been accurate.

17. With respect to the element of intent, Plaintiffs failed to establish by a preponderance of evidence that Grossman intended to deceive, or from which his intent to deceive may be persuasively inferred. Grossman submitted two reasonably true, correct, and accurate financial statements upon the Banks' request, and he answered the limited questions posed to him regarding those financial statements that were asked of him by any of the Banks' officers or directors. Plaintiffs have not presented sufficient evidence of any falsity of a then present or past asserted fact or of any reckless indifference or reckless disregard for the accuracy of the information as to future projections in either financial statement, or even that those projections lacked a reasonable basis. To the contrary, Grossman generally established a reasonable factual basis for each entry on Exhibits 9 and 10, as to projected cash flow, income, and cash on which the Plaintiffs allegedly relied. This Court accordingly concludes and finds that Plaintiffs have failed to prove that Grossman had the requisite intent to deceive the Banks when he submitted either his March 30, 1987, or his June 21, 1988, personal financial statements.

## CONCLUSION

Plaintiffs have failed to establish by a preponderance of the evidence that Grossman caused to be submitted to Plaintiffs any materially false financial statement respecting his financial condition on which Plaintiffs reasonably relied, that he caused any financial statement to be published with intent to deceive the Plaintiffs. Indeed, Grossman's 1987 statement was not relied on by the Banks to issue the first loan, and his 1988 statement was not shown to be materially

false. The first loan was closed and paid, and the Banks did not rely on the 1987 Statement when issuing the second loan. In any event, the 1987 statement was not shown to be materially false. In light of the foregoing, the Debtor's obligation to the Plaintiffs in the sum of $1,088,617.13 pursuant to his guaranty of Loan 2 is dischargeable. Judgment to that effect has been entered.

W/N and W/WC assigned their judgments to WFC during trial. The assignors no longer own these judgment debts, but WFC does. However, these debts and the others owed to the third bank are dischargeable.